RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0421P (6th Cir.)
File Name: 01a0421p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CAROLYN COMSTOCK,
       *Plaintiff-Appellee,*

    *v.*

NORRIS MCCRARY; V. S.
THYAGARAJAN; and DAVID
HOWELL,
       *Defendants-Appellants.*

No. 99-2448

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-74806—Anna Diggs Taylor, District Judge.

Argued: April 25, 2001

Decided and Filed: December 12, 2001

Before: MARTIN, Chief Judge; MOORE, Circuit Judge;
O'MALLEY, District Judge.[*]

_____

[*] The Honorable Kathleen McDonald O'Malley, United States District
Judge for the Northern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ARGUED:** Michael C. McDaniel, OFFICE OF THE ATTORNEY GENERAL, TORT DEFENSE DIVISION, Lansing, Michigan, for Appellants. Todd J. Stearn, BRIAN DAILEY LAW FIRM, Farmington Hills, Michigan, for Appellee. **ON BRIEF:** John L. Thurber, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellants. Brian T. Dailey, BRIAN DAILEY LAW FIRM, Farmington Hills, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which MARTIN, C. J., joined. O'MALLEY, D. J. (pp. 29-30), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Billy Wade Montgomery committed suicide on March 3, 1995 at the Reception and Guidance Center ("RGC") of the State Prison of Southern Michigan. Plaintiff-appellee Carolyn Comstock, the personal representative of Montgomery's estate, brought suit under 42 U.S.C. § 1983 against defendants-appellants Norris McCrary, a psychologist, V.S. Thyagarajan, a medical doctor, and David Howell, a physician's assistant, all of whom were employed by the Michigan Department of Corrections, alleging, *inter alia*, that defendants displayed deliberate indifference to Montgomery's serious medical needs, thereby denying him his rights under the Eighth Amendment to the Constitution. The plaintiff and the defendants cross-moved for summary judgment. The district court denied both parties' motions for summary judgment, concluding that the defendants were not protected from suit by qualified immunity. The defendants appeal the district court's denial of their motions for summary judgment. For

*Kentucky University Bd. of Regents*, 163 F.3d 395, 396 (6th Cir. 1998). For example, plaintiff asserts that defendant Howell *did* subjectively perceive Montgomery's risk of suicide if *released* from suicide watch. *Cf.* op. at 26 ("[e]ven if he was aware that Montgomery was suicidal, Howell would not have perceived that Montgomery posed a substantial risk of harm to himself *while on suicide watch*") (emphasis added). In his appellate brief, Howell does not merely fail to concede this, he disputes it, and acknowledged this dispute at oral argument. Simply, defendants seek to stipulate to a set of facts in an effort to justify appellate review while steadfastly refuting the inferences plaintiffs assert can and should be drawn from those facts. Without an "unqualified concession" on *all* issues of fact, however, we do not have jurisdiction over "an interlocutory appeal from the denial of qualified immunity." *Id.* at 396-97.

Clearly, all questions presented by this appeal, including the jurisdictional ones, would have been easier if the district court had issued an opinion delineating those facts upon which it relied in rendering judgment. I believe, however, that the district court correctly concluded, as the parties then agreed, that material facts relevant to qualified immunity are in dispute. And, I believe that defendants' appellate "stipulation" does nothing to alter this fact. Accordingly, I believe we should dismiss this appeal for lack of jurisdiction and revisit these issues, if at all, after a full development of the record. This course would allow us to rely on a fact-finder's inferences, rather than our own. For these reasons, I respectfully dissent.

the following reasons, we **AFFIRM** the district court's judgment as to defendant McCrary, but **REVERSE** as to defendants Howell and Thyagarajan.

## BACKGROUND

On February 22, 1995, Montgomery was transferred from the St. Joseph County Jail in Centerville, Michigan, where he had been housed since June 28, 1994, to the RGC at the State Prison of Southern Michigan.[1] Montgomery was completing a sentence for his third Operating Under the Influence of Liquor conviction. His earliest release date from prison was April 11, 1995. Upon his arrival at the RGC, Montgomery was placed in administrative segregation on the floor of a cell block known as "Top 6."

On March 2, 1995, Montgomery was referred for psychological evaluation by a resident officer who observed him acting despondently in his cell, and had heard that the previous shift's guard had removed sharp objects from Montgomery out of concern for his safety. Norris McCrary, a prison psychologist, was assigned to evaluate Montgomery. McCrary met with Montgomery in his cell at 10:55 a.m. that morning. McCrary's notes indicate that, in the course of their meeting, Montgomery reported feeling depressed and stated that "his nerves are shot and that he 'feels like he's going to die.'" Joint Appendix ("J.A.") at 61. McCrary then noted, "Inmate reports feeling suicidal but with no specific plan. Lethality however appears to be moderate." *Id.* McCrary's notes also reveal that Montgomery "[s]tated that he wasn't being pressed or threatened by anyone." *Id.* At 11:30 a.m., McCrary placed Montgomery on close observational status, or "suicide watch." While on suicide watch, Montgomery was dressed in a suicide or "bam-bam" suit, restricted to finger foods, prohibited from having sharp objects, and checked on every ten minutes. McCrary also scheduled

---

[1]All male felons over the age of 21 pass through the RGC for medical and security clearance prior to being sent to the appropriate correctional facility.

Montgomery to meet with the Outpatient Mental Health Team.  J.A. at 24, 61, 107.

The next day, March 3, 1995, at 9:45 a.m., Howell conducted a previously scheduled physical examination of Montgomery.  McCrary's notes from his interview with Montgomery the day before were not in the file.  J.A. at 179 (Howell Dep.).  Howell made a contemporaneous "progress report," which noted the following:

Patient seen in "BAM-BAM" suicide prevention garment . . . states that he is not depressed and has no thoughts of self-harm.  States that his main problem is that other inmates have threatened to kill him because they believe he is a "snitch" — stated he had thoughts of dying in order to get locked down in safe area.  No psychotic signs/symptoms noted.

J.A. at 62.    Howell's progress note was placed in Montgomery's medical file.  Howell did not report to anyone that Montgomery had been labeled a snitch.[2]

Thyagarajan, who was Howell's supervisor, reviewed Howell's progress note as required by prison procedure, and signed off on the note sometime on March 3, 1995.  J.A. at 62, 203.  He never met with Montgomery or looked at his medical records.

At 10:13 a.m. that same morning, following Howell's visit, McCrary met with Montgomery for slightly less than a half hour, during which time he reevaluated Montgomery's mental state.  McCrary performed his evaluation by speaking with Montgomery.  He stated that while the conversation did not

---

[2]Being labeled a "snitch" was dreaded, because it could make the inmate a target for other prisoners' attacks.  J.A. at 115 (Smith Dep.). McCrary testified in his deposition that he knew that "a prisoner in prison definitely doesn't want to be labeled a snitch, that's probably the worst label that you can — could have put on you if you were in prison."  J.A. at 97 (McCrary Dep.); *see also* J.A. at 67 (Howell Dep.) (stating that "to be called a snitch can place you at peril").

---

## DISSENT

---

KATHLEEN McDONALD O'MALLEY, District Judge, dissenting. Although the majority's opinion is generally well-reasoned and certainly well-written, I must respectfully dissent because I believe we do not have jurisdiction in this case.  As the majority notes, "factual issues were contested before the district court," op. at 8, and, when the district court denied the defendants' motion for summary judgment based on qualified immunity, it "fail[ed] to make findings of fact," *id.* at 8 n.3.  Thus, the factual record on appeal is, at best, unsettled and incomplete.  The Supreme Court has ruled that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the trial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).  Accordingly, I believe we do not have jurisdiction over this appeal.

The majority avoids the jurisdictional hurdle by stating that, "for the purposes of this appeal, both parties have explicitly stipulated to plaintiff's version of the facts."  Op. at 8.  I believe the defendants' "stipulation" in this case is no jurisdictional cure.  First, defendants' "stipulation" appears overly convenient.  Earlier, the defendants stipulated in district court that the court's order denying the motion for summary judgment based on qualified immunity was unobjectionable "both as to form and content."  Joint Appendix at 251. In essence, defendants stipulated below that there were material facts in dispute precluding a finding of qualified immunity.  How can defendants now propose to stipulate on appeal that those same facts mandate a finding of qualified immunity?

Second, despite their latest "stipulation," the defendants' version of certain facts clearly does not "concede the best view of the facts to the plaintiff." *Booher v. Northern*

substantial risk that Montgomery would harm himself, we **REVERSE** the district court's order denying Howell's motion for summary judgment based on qualified immunity.

## C. Defendant-Appellant Thyagarajan

Plaintiff attempts to overcome Thyagarajan's qualified immunity by asserting that he displayed deliberate indifference to Montgomery's medical needs by failing to properly supervise Howell. "This court has held that § 1983 liability must be based on more than respondeat superior, or the right to control employees." *Shehee*, 199 F.3d at 300. The supervisor is not liable for failing to supervise the offending employee unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays v. Jefferson Cty.*, 688 F.2d 869, 874 (6th Cir. 1982)). If Howell did not violate Montgomery's clearly established right to medical treatment, then Thyagarajan is entitled to qualified immunity because he did not "implicitly authorize[]" or "knowingly acquiesce[]" in any unconstitutional conduct. Therefore, the district court's decision with respect to Thyagarajan must also be **REVERSED**.

## IV.  State Law Claims

Because the district court will maintain jurisdiction over at least one federal cause of action, we decline to decide the defendants' state law claims.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part the district court's judgment, and **REMAND** for further proceedings.

---

last a long time, it "was enough time for me to ascertain from him, you know, was he feeling suicidal." J.A. at 84 (McCrary Dep.). McCrary then stated that he "suspected that something was going on between Mr. Montgomery and the other prisoners. But Mr. Montgomery did not inform me of what that was. I asked him that question again when I saw him on the 3rd, and he still didn't say anything to me about that." *Id.* Based on their conversation, McCrary concluded that,

> [H]e wasn't suicidal. That's what he told me. He said he wasn't feeling suicidal. He had no thoughts of going to hurt himself. I did ask him some questions, mental status. And he said something that he knew he was going to go back up to Top Six.
>
> And when he told me that he wasn't feeling suicidal, and based just on his affect and how he came across to me, *I took him at his word that he wasn't feeling suicidal*. So I took him off of close observational status.

*Id.* (emphasis added). According to McCrary, there was a change from Montgomery's demeanor the day before: Montgomery was "less anxious," and "he didn't seem to be as worried and uptight as" he had been. *Id.* Indeed, he was like "a lot of prisoners who've been in the same situation." *Id.* Therefore, he recommended that Montgomery be sent back to his cell in administrative segregation.

At approximately 4:29 p.m. that afternoon, Montgomery committed suicide in his cell on Top 6 by hanging himself with a sheet fashioned into a rope. He left a suicide note for his girlfriend which read: "I love you Cindy, and I always will. I am sorry, but I couldn't let them do it to me. Please forgive me. I will always be with you. Love, always and forever." J.A. at 70 (Suicide Note).

Subsequent to her appointment as the representative of Montgomery's estate, Comstock commenced this litigation by bringing suit under 42 U.S.C. § 1983 against McCrary, Howell, and Thyagarjan, in their individual capacities. The complaint alleged that defendants violated Montgomery's

Eighth Amendment right to be free from cruel and unusual punishment by displaying deliberate indifference to his medical needs, and that, under state law, they were grossly negligent in his care. In an amended complaint, Comstock added an Eighth Amendment failure-to-protect-from-harm claim against McCrary and Howell.

Comstock then moved for summary judgment with respect to defendant McCrary, alleging that there was no genuine issue of material fact that McCrary recklessly removed Montgomery from suicide watch "without conducting any investigation into the reasons and causes underlying Mr. Montgomery's suicidal ideation" and that this conduct proximately caused Montgomery's death. J.A. at 36. According to Comstock, McCrary's failure to perform a thorough psychological examination, which would have revealed that Montgomery had been labeled a "snitch" and that his suicidal urge was motivated by his fear of the other inmates, amounted to deliberate indifference to Montgomery's serious medical needs. As evidence of this deliberate indifference, McCrary simply took Montgomery at his word that he was feeling better and released him from suicide watch, instead of taking steps to confirm Montgomery's changed mental status, identify the source of Montgomery's fears, and take further action to protect Montgomery from himself.

In response, McCrary filed a motion for summary judgment, asserting that he did not perceive that there was a substantial risk of harm to Montgomery on March 3, 1995 when he made the decision to release Montgomery from close observation. J.A. at 160. Moreover, McCrary argues, whether he could have performed a more in-depth evaluation of Montgomery is irrelevant because a dispute over a doctor's medical judgment does not amount to a violation of a patient's constitutional rights. He then asserted that, "[a]t the very least," he was entitled to qualified immunity. J.A. at 162. McCrary also sought summary judgment on the claims for failure to protect under the Eighth Amendment and gross negligence under state law.

watch. During Howell's physical examination, Montgomery was in close observational status and dressed in a suicide prevention garment. Montgomery had been stripped of his personal clothing, limited to finger foods, and was checked on every ten minutes; all sharp objects had been removed from his surroundings. It is simply impossible for us to conclude that Howell perceived a substantial risk that Montgomery would commit suicide when he observed Montgomery in these circumstances. Thus, plaintiff has failed to put forward facts that would demonstrate that Howell was aware of a substantial risk of serious harm to Montgomery, i.e., that Montgomery actually would, or could, inflict serious harm to himself while on suicide watch.

In other words, even if he subjectively perceived that Montgomery was suicidal, Howell had no way of knowing that McCrary would remove Montgomery from suicide watch shortly after the physical examination and thus that Montgomery would have the opportunity to carry through on any perceived suicidal intentions. Howell played no part in McCrary's decision to remove Montgomery from suicide watch. Although Howell recorded his observations of Montgomery in a brief progress note, the record is clear that McCrary failed to consult this progress note before deciding to remove Montgomery from suicide watch. In addition, we cannot conclude that Howell's progress note evidences deliberate indifference to Montgomery's health or safety. The progress note merely records what Montgomery said to Howell regarding why he was on suicide watch and notes, "No psychotic signs/symptoms noted." J.A. at 62. Plaintiff's theory is that Howell should have done more than record his observations — that once Howell was aware that Montgomery had been labeled a "snitch" by other prisoners, he should have taken additional steps to protect Montgomery from himself. Given that Montgomery was already on suicide watch, however, there was nothing more Howell reasonably should have done to secure Montgomery's health and safety.

Because plaintiff has failed to put forward any facts demonstrating that Howell subjectively perceived a

medical needs treated with deliberate indifference"); *Horn*, 22 F.3d at 660 (recognizing that prisoner's psychological needs may constitute serious medical needs which require medical attention, especially when they result in suicidal tendencies); *Danese*, 875 F.2d at 1244 (noting that if officials have knowledge that prisoner is suicidal, they cannot ignore his needs).

Based on case law from the Supreme Court and our circuit, we conclude that a reasonable prison psychologist in 1995 "would have clearly understood that [he] was under an affirmative duty" to offer reasonable medical care to a prisoner whom he knew to be suicidal, in the circumstances confronted by McCrary. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). Because, viewed in the light most favorable to plaintiff, McCrary's conduct violated Montgomery's constitutionally protected right to medical care for his serious medical needs under the Eighth Amendment, and the constitutional right was clearly established such that a reasonable official, at the time McCrary acted, would have understood that his behavior violated that right, we **AFFIRM** the district court's denial of summary judgment with respect to McCrary.

## B.  Defendant-Appellant Howell

As noted earlier, to establish that Howell violated Montgomery's clearly established right to medical treatment, plaintiff must put forward facts which would show that Howell was deliberately indifferent to Montgomery's health and safety. Plaintiff is unable, however, to allege facts from which we could conclude that Howell subjectively perceived "a substantial risk of serious harm" to Montgomery's health and safety. Of course, Montgomery was presumptively suicidal because he was on suicide watch. Plaintiff, however, must do more than put forward facts that would show that Howell, the physician's assistant, perceived Montgomery to be suicidal. Even if he was aware that Montgomery was suicidal, Howell would not have perceived that Montgomery posed a substantial risk of harm to himself while on suicide

Defendants Howell and Thyagarajan then moved for summary judgment, respectively, asserting that they failed to perceive that Montgomery posed a risk of harm to himself and that their lack of knowledge was not disputed. Each also invoked the shield of qualified immunity.

The district court denied plaintiff's motion for summary judgment on her claims of deliberate indifference and gross negligence, as well as McCrary's cross-motion on those counts, finding that summary judgment was inappropriate because there were genuine issues of material fact in dispute. The district court also denied McCrary's motion for summary judgment based on qualified immunity, although it granted McCrary's motion for summary judgment on the failure to protect claim. J.A. at 251.

All three defendants then filed a renewed motion for summary judgment arguing for qualified immunity in light of this court's decision in *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999) (en banc), handed down after the district court's first order. Thereafter, the district court held a hearing on the applicability of *Williams* to the case before it, and again denied the defendants' motion for summary judgment. J.A. at 303. Defendants' timely interlocutory appeal followed. J.A. at 288.

## ANALYSIS

### I.  Jurisdiction

Before proceeding to the merits of this case, we must consider our jurisdiction to hear this appeal. A district court's denial of a motion for summary judgment is generally not appealable because the applicable statute, 28 U.S.C. § 1291, only vests appellate courts with jurisdiction over a district court's "final decision." "Given this statute, interlocutory appeals — appeals before the end of district court proceedings — are the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309 (1995). The Supreme Court has held, however, that under the collateral order doctrine, "a district court's denial of a claim of qualified immunity, to the extent that it

turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Subsequently, in *Johnson v. Jones*, 515 U.S. at 313, the Supreme Court clarified that the *Mitchell* decision was "explicitly limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' . . . but the purely legal issue what law was 'clearly established'." Consistent with *Johnson*, we have stated that "in order for an interlocutory appeal to be appropriate, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) (citing *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)).

Although factual issues were contested before the district court, for the purposes of this appeal, both parties have explicitly stipulated to plaintiff's version of the facts.[3] *Cf. Booher v. N. Kentucky Univ. Bd. of Regents*, 163 F.3d 395, 396 (6th Cir. 1999) (determining that appellate court lacked jurisdiction over defendants' appeal from district court's decision denying them qualified immunity because, while defendants claimed in their brief that they had conceded facts on appeal, defendants actually disputed "several of the factual determinations underlying the district court's denial of qualified immunity"). Therefore, just as we held in *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc), another prisoner-suicide case in which the defendants-officials invoked qualified immunity, because this case turns on whether the facts, admitted by the defendants for purposes

---

[3] Our review is made difficult by the district court's failure to make findings of fact for this court to assume as true. *Cf. Johnson*, 515 U.S. at 319 (noting that when "[d]istrict judges . . . deny summary judgment motions without indicating their reasons for doing so[,]" appellate courts "may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed"). In order to conduct our review, we have, therefore, read the record in the light most favorable to the plaintiff.

constituted deliberate indifference to the risk that Montgomery would harm himself when presented with the opportunity. *Cf. Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 395-96 (5th Cir. 2000) (finding that plaintiff had presented sufficient evidence for jury to conclude that sheriff who knew that inmate was suicidal was deliberately indifferent to inmate, even though he "did not completely ignore [inmate's] suicidal condition," because he put inmate in cell with "tie-off points" and a blind spot).

### (4)  Clearly Established Law

Once we have concluded that plaintiff has alleged facts which, if true, would show the violation of a constitutional right, we must assess whether that right was clearly established in March 1995 such that a reasonable official would have understood that his conduct violated the right. *See Saucier*, 121 S. Ct. at 2159; *Danese*, 875 F.2d at 1242 (noting that relevant question "is whether any official could have, in light of the preexisting law, reasonably believed that his action was lawful"). As the Supreme Court has instructed, we need not find a case in which "the very action in question has previously been held unlawful," but, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

The right at issue in this case is not, as defendants argue, the right to be diagnosed accurately for one's propensity to commit suicide; Montgomery had already been correctly identified as suicidal by McCrary and the prison staff. As we have discussed above, the right that plaintiff claims on Montgomery's behalf is the more basic right to continuing medical treatment once a prisoner has been determined to be suicidal. This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known. *See Williams*, 186 F.3d at 691 (recognizing implicitly that suicidal condition is serious medical condition which requires medical attention and relying on *Estelle*, 429 U.S. at 105-06, for principle that "the right at issue is [prisoner's] right not to have his serious

dose at a time, under the supervision of a nurse who would watch while he took it to prevent hoarding." *Id.* at 692. In light of this method of treatment, we noted that "[t]here is nothing to suggest that the doctors were failing to treat [the inmate] or doing less than their training indicated was necessary." *Id.*

In this case, in contrast, there is an abundance of evidence that McCrary did not respond reasonably to the substantial risk of harm, of which he was subjectively aware, to Montgomery's health and safety. *See Farmer*, 511 U.S. at 844. Contrary to McCrary's assertions, we do not quarrel over whether "an additional diagnostic technique[] or form[] of treatment," *Estelle*, 429 U.S. at 107, would have been helpful in preventing Montgomery's suicide. On the record before us, it does not appear that McCrary chose one medically reasonable form of treatment over another, as did the doctor in *Estelle*, who treated an inmate suffering from chronic back pain with bed rest, muscle relaxants, and pain relievers, instead of ordering an X-ray which might have better diagnosed the inmate's problem, or the psychiatrists in *Williams*, who took the precaution of administering the inmate's medication to him in a pill line, although not in liquid form, to prevent the possibility of hoarding and overdosing. In this case, the plaintiff has alleged facts which show that McCrary released Montgomery from suicide watch without making any "reasoned assessment or evaluation of the patient's suicide risk," J.A. at 126 (Shiener Dep.).

Because we must adopt as true, for purposes of our review, Dr. Shiener's conclusion that McCrary's evaluation was "grossly inadequate" and was conducted with "none of [McCrary's] professional skills," J.A. at 124, as well as the fact that McCrary's follow-up "evaluation" left him with no way to corroborate Montgomery's self-serving statement that he was feeling better, despite the fact that McCrary knew that a suicidal prisoner on close observation may lie in order to gain the opportunity to commit suicide, we conclude that plaintiff has presented sufficient evidence that, if true, would show that McCrary's evaluation was unreasonable and

of this appeal, "'show[] a violation of clearly established law,' not on 'which facts the parties may be able to prove,' the district court's denial of qualified immunity is a 'final order' under 28 U.S.C. § 1291, and we have jurisdiction to decide the case on the merits." *Id.* (quoting *Johnson*, 515 U.S. at 311).

## II.  Standard of Review

We review a district court's denial of qualified immunity de novo. *Shehee*, 199 F.3d at 299; *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

## III.  Qualified Immunity

In civil suits for money damages, government officials acting in their official capacity are entitled to qualified immunity for discretionary acts which do not violate clearly established law of which a reasonable person would have known. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is not a defense to liability; where it is applicable, its purpose is to shield the officer from suit altogether, saving him from the burdens of discovery and costs of trial. *Mitchell*, 472 U.S. at 526. The Supreme Court has recently clarified that, in order to assess whether the defendants-officials in this case should be cloaked with immunity from suit, we must engage in a two-part, sequential analysis: first, we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to her, show that the defendant-official's conduct violated a constitutionally protected right; if we answer the first question in the affirmative, we must then determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right. *Saucier v. Katz*, 121 S. Ct. 2151, 2156 (2001).

It is crucial, the Supreme Court has noted, that the second inquiry "be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* Thus, "[t]he

relevant, dispositive inquiry . . . is whether would it be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." In other words, as the Court stated in *Anderson*, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. We need not, of course, find a case in which "the very action in question has previously been held unlawful," but, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Id*. In evaluating the contours of the right, "we look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Dickerson*, 101 F.3d at 1158 (internal quotation omitted).

Addressing the first inquiry of the qualified immunity analysis, whether plaintiff has alleged facts which, when assumed to be true, show that the defendants' conduct violated a constitutional right, the Supreme Court has held that, under the Eighth Amendment's proscription on cruel and unusual punishment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The Court explained that a prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs. *Id.* at 104. While the right to medical care for serious medical needs does not encompass the right "to be screened correctly for suicidal tendencies," we have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner. *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027 (1990), (noting that "[i]f a prisoner asks for and needs medical care, it must be supplied"); *see also Yellow Horse v. Pennington Cty.*, 225 F.3d 923, 927 (8th Cir. 2000) (holding that prisoner "had a clearly established constitutional right to be protected from the known risks of suicide and to have his serious medical needs attended to"); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (noting that prison inmate has Eighth

other than to ask Montgomery how he was feeling, and then to take him at his word that he was better. Our conclusion that McCrary's conduct was more than negligent is bolstered by the fact that he had found Montgomery sufficiently at risk to put him on suicide watch only the day before; that he *knew* that something was going on between Montgomery and the other inmates, and that the other inmates did not like Montgomery; and that he *knew* that suicidal inmates on close observational status may lie about their state of mind to facilitate their transfer to a place where they have an opportunity to commit suicide, but he took no precaution to account for that possibility.

Having concluded that McCrary's conduct was clearly more than negligent, we are left with the question whether it was recklessly indifferent. Defendants strenuously argue that the answer is provided by *Williams v. Mehra*, another prisoner-suicide case, in which we held that the defendants-psychiatrists who administered care to the prisoner should be granted qualified immunity. We believe *Williams* is completely distinguishable from the instant case. The *Williams* decision was based upon the en banc court's conclusion that while the defendants-psychiatrists there perceived that the patient-inmate was suicidal, they did not, through their method of treatment, clearly disregard the risk that he would inflict self-harm. In that case, the defendants-psychiatrists knew that the inmate had previously attempted to kill himself by overdosing on pills, so they administered his medication to him in a pill line to prevent the possibility of hoarding. Despite the precaution of the pill line, the inmate managed to stockpile pills and ultimately killed himself by overdosing. *See Williams*, 186 F.3d at 688-89. We rejected the plaintiff's § 1983 claim alleging that the defendants-psychiatrists who had cared for the inmate were deliberately indifferent to his medical needs because they failed to give him his medication in liquid, as opposed to pill, form. In concluding that defendants-psychiatrists did not disregard the risk of harm to the inmate, we noted that "the doctors recognized the possibility of suicide and prescribed [the inmate's] medication knowing that it would be dispensed, one

McCrary offers nothing to refute the evidence that his level of care was grossly substandard other than to say that he exercised his medical judgment when he removed Montgomery from suicide watch. Neither does he dispute plaintiff's assertion that when he discharged Montgomery, he failed to follow the prison's policies with regard to suicide prevention. Indeed, the Michigan Department of Corrections Police Directive on Suicide Prevention, included in the record, J.A. at 150, indicates that a psychologist's evaluation of an inmate who has been placed in close observation must "*include review of the prisoner's institutional file and health record* as well as an interview with the prisoner." J.A. at 153 (emphasis added). There is nothing in the record to indicate that McCrary followed these procedures. *Cf. Yellow Horse*, 225 F.3d at 927-28 (affirming summary judgment for prison guard because plaintiff could point to no evidence showing that guard failed to follow prison policies when releasing inmate from suicide watch).

After reviewing this record in the light most favorable to the party alleging a constitutional injury, we are left with the impression that McCrary did not act with actual malice or an intent to harm Montgomery. On the other hand, McCrary's failure to conduct *any* investigation into whether Montgomery was lying to him about his state of mind must, when compared to the standard of care described by Dr. Walsh and Smith for evaluating a suicidal inmate's mental state, as well as the prison's internal policies for suicide prevention, be considered more than negligent. *Cf. Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995) (holding that where nurse treated inmate for asthma and inmate subsequently died of heart failure, nurse was, at most, negligent in her care, despite fact that she failed to learn from inmate's medical records that he had high blood pressure and to treat him accordingly, because she was not aware that inmate was at substantial risk of heart failure). Simple negligence would have been the failure to perform one, or even some, of the tasks that the other psychologists testified would be "routinely" conducted by them in evaluating a known suicide risk. In this case, however, McCrary admittedly performed *none* of these tasks,

Amendment right be free from deliberate indifference to serious psychiatric needs).

An Eighth Amendment claim has two components, one objective and one subjective. To satisfy the objective component, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Farmer*, 511 U.S. at 837. Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838 (emphasis added).

The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment. *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Farmer*, 511 U.S. at 835 (noting that deliberate indifference "describes a state of mind more blameworthy than negligence"). When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835; *see also Horn*, 22 F.3d at 660 ("Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain."). Instead, "deliberate

indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836.

Although the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by "the usual ways." *Farmer*, 511 U.S. at 842. Thus, the Supreme Court noted that it was permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* at 842. Moreover, the Court warned, a prison offical may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8.

With these principles in mind, we turn to the merits of plaintiff's case.

**A. Defendant-Appellant McCrary**

**(1) Objective component of Eighth Amendment claim**

As noted above, to satisfy the objective component of an Eighth Amendment claim, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Farmer*, 511 U.S. at 834. We have held that a prisoner's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994). Because plaintiff alleges that defendants were indifferent to Montgomery's psychological needs, namely his suicidal tendency, she easily satisfies the objective component of her constitutional claim.

**(2) McCrary's subjective knowledge that Montgomery posed serious risk of harm to himself**

To satisfy the first part of the subjective component of her Eighth Amendment claim, plaintiff alleges that McCrary had

Brian Smith, the Department of Corrections psychologist, testified that it would be "helpful" to review the results of any psychological testing when evaluating an inmate's mental health; it would be "helpful" to review the medical file, and that he could not recall an incident in which he had released an inmate from suicide watch without reviewing the medical file; that it would be "routine" to talk to the custody officers on the inmate's cell block when evaluating the inmate; and that, prior to placing an inmate on close observational status, he would have checked the log books for observations made by custody officers for "collaborative information." J.A. at 112-13.

Finally, Dr. Shiener, a psychiatrist and an expert for the plaintiff, testified that McCrary's March 3, 1995 interview with Montgomery was "grossly inadequate," and that McCrary "used none of his professional skills" in making the assessment that Montgomery was no longer suicidal. J.A. at 124 (Shiener Dep.). Dr. Shiener noted that "certain obvious and glowing factors were ignored in a very cavalier manner," J.A. at 123 (Shiener Dep.), including the fact that only the day before, McCrary had "judged [Montgomery] to be at such great risk that he should be relieved of his clothes; not given utensils but only finger foods; be placed in a situation of close observation and . . . that nothing had really changed [from the day before]." J.A. at 125-26 (Shiener Dep.). Dr. Shiener then elaborated:

> There's no documentation that he [McCrary] talked to him [Montgomery] in any depth or at any length. There's no documentation that he described or appreciated what had changed, other than the fact that, "Oh, he was saying he was going to kill himself yesterday. He's saying he's not going to do it today." *And there was no detailed description of his emotional state, his state of agitation, his state of desperation, what his resolution was about some of the problems he was facing in the population. There was none of that.*"

J.A. at 127 (Shiener Dep.) (emphasis added).

Montgomery's serious medical needs are depositions from three experts, one by Dr. Robert Walsh, who was the Administrator of Psychological Services for the Jackson Clinical Complex, one by Brian Smith, a Department of Corrections psychologist in 1995, and one by Dr. Gerald Shiener, the plaintiff's expert psychiatrist, describing the appropriate standard of care.

Dr. Walsh testified in a deposition that, had he committed a prisoner to close observational status on day one, he would perform the following evaluation on day two:

> I would review whatever file material I had on him. I would probably talk with the officers that are up there in terms of any observations they might have on him. And then I would sit down and have an interview with him.

> I would evaluate what he was telling me and compare it with what was going on the day before. I would evaluate his affect or his emotion, how coherent and how clear his thinking and thoughts seem to be and I would try to compare the difference between the two to look for any change in terms of the factors that were present the day before and how they compare with the way he is interacting on this new day.

J.A. at 133 (Walsh Dep.). Dr. Walsh then stated that he would not take anyone off suicide watch without reviewing his medical file, J.A. at 134; that it was "routine[]" to talk to the custody officers who referred the inmate to psychological services, because they would tell him anything "that the prisoner isn't telling" him, J.A. at 134; that he would "definitely" look at the control center log book for "[a]nything unusual" that would be noted there, J.A. at 138, and that he would "definitely" look at any psychological testing that had been done, J.A. at 140. Finally, he noted that it would be "inconceivable" that he would fail to consult the above sources of information if they were available to him. J.A. at 149.

subjective knowledge of Montgomery's risk of suicide on March 3, 1995 because he had placed him on close observational status the day before. McCrary counters that because Montgomery lied to him about his mental state on March 3, 1995, he did not subjectively perceive that Montgomery was suicidal when he released him from suicide watch. Because he lacked the requisite subjective perception of Montgomery's suicidal state, McCrary argues that he cannot be found deliberately indifferent to Montgomery's medical needs.

While defendants try to frame our analysis as whether McCrary perceived that Montgomery was suicidal *when he made the decision to release Montgomery from close observation*, we believe that the proper analysis requires us to ask whether McCrary perceived that Montgomery was suicidal *when he commenced his evaluation of Montgomery on the morning of March 3, 1995*. We believe that we must focus on this anterior question because it was McCrary's cursory evaluation of Montgomery prior to his recommendation that Montgomery be released which, according to plaintiff, constituted the deliberate indifference to Montgomery's serious medical needs.

When viewed from the proper perspective, we believe that the plaintiff has alleged sufficient facts from which a trier of fact could conclude that McCrary subjectively perceived that Montgomery was suicidal when he went to evaluate Montgomery on the morning of March 3, 1995. We know that McCrary had found Montgomery suicidal on March 2, 1995 because he took notes remarking on Montgomery's suicidal state and placed Montgomery on close observational status. J.A. at 61 (McCrary progress note). In the absence of any intervening events, we must conclude that, when McCrary went to interview Montgomery on the morning of March 3, 1995, he still believed him to be at risk of serious self-inflicted harm. *Cf. Ellis v. Washington Cty. & Johnson City, Tenn.*, 198 F.3d 225, 227 (6th Cir. 1999) (rejecting plaintiff's claim that jailors were deliberately indifferent to prisoner because prisoner gave no indication of his suicidal

state from the time he arrived at jail to moment he committed suicide that would have put a reasonable jailor on notice of prisoner's suicidal intent); *Horn*, 22 F.3d at 660 (same).

Moreover, plaintiff has put forward evidence tending to show that McCrary was aware that Montgomery was having problems with other inmates, which was at least one source of Montgomery's suicidal urge. Although in his deposition McCrary stressed that Montgomery did not explicitly tell him, either on March 2 or March 3, 1995, that he had been labeled a "snitch" and that the other prisoners were threatening him, McCrary's deposition testimony reveals that he had knowledge that Montgomery was not on good terms with the other members of his cell block.

Q: When you evaluated Mr. Montgomery on March 2nd and March 3rd of '95, did, in your opinion, did you feel like he felt in any physical jeopardy or peril from other inmates?

A: That was something that was on my mind that I asked Mr. Montgomery several times, both on the second and the third, but — *I had a suspicion that something was going on, but Mr. Montgomery would not tell me directly that something was going on between him and the other prisoners.*

Q: Why were you suspicious that something was going on?

A: The first time I had contact with him, on the 2nd, when I went up to top six to see him, *the other inmates were making a lot of noise and racket, which seemed to me sort of out of place.* I mean, it was more than just general chitchatter. When I first had contact with Mr. Montgomery I was interviewing him through his cell door, and I couldn't hear exactly what the other inmates were saying, but they just seemed to be making a lot of agitation, a lot of noises and whatnot. And I just — and in terms of me talking with him, I asked him

*his cell in administrative segregation*, J.A. at 85; (4) there was no reason why he did not look at the medical file before meeting with Montgomery, and that he easily could have looked at the file but chose not to, J.A. at 85; (5) information gleaned from conversations with custody officers who observed Montgomery would have been useful in evaluating Montgomery's mental state, J.A. at 87; and (6) entries in the log book from February 28, 1995, just two days before he evaluated Montgomery, which indicated that Montgomery stated "they are going to kill him," J.A. at 105, that he did not want yard time, that he would not open his door during yard time, and that he refused a shower, J.A. at 106, would have alerted him to the fact that Montgomery was lying to him about feeling threatened by other inmates, J.A. at 98. Finally, McCrary stated that, if he had known all of the information that was available to him, he would not have removed Montgomery from close observational status, J.A. at 102, and that he would have determined that Montgomery was a suicide threat, J.A. at 104.

McCrary's defense hinges on whether his decision to evaluate Montgomery by merely asking him questions, as opposed to performing any additional corroborative investigation, constituted "an inadvertent failure to provide adequate medical care," *Estelle*, 429 U.S. at 105, or a reasonable response to a known risk to the inmate's health or safety, *Farmer*, 511 U.S. at 844, both of which would entitle him to qualified immunity.[5] Supporting plaintiff's contentions that McCrary was deliberately indifferent to

_____

[5] Although defendants strenuously argue that "if medical treatment is given it is not a courts [sic] job to second guess the treatment given," Appellant's Reply Br. at 1, the issue is not whether McCrary provided *some* medical attention to Montgomery, but rather whether McCrary's conduct evinced deliberate indifference to Montgomery's serious medical needs. Defendants' position is, apparently, that if a prison doctor offers some treatment, no matter how insignificant, he cannot be found deliberately indifferent. This is not the law: as the Supreme Court noted in *Estelle*, 429 U.S. at 104-05 & n.10, a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment.

evaluation; (2) he failed to follow form CHJ-180, an evaluation of suicide risk prisoners, and to review Montgomery's institutional file and health record; and (3) he failed to complete a written health record when removing Montgomery from close observation. J.A. at 40 n.3, 153 (Suicide Prevention Policy Directive).

Notwithstanding the facial inadequacy of McCrary's March 3, 1995 evaluation, McCrary's own deposition testimony reveals that he did not respond reasonably to, and therefore disregarded, the risk that Montgomery might inflict harm upon himself when he interviewed Montgomery on the morning of March 3, 1995. His testimony is particularly striking in light of the fact that McCrary testified that he knew that a prisoner might lie about how he was feeling in order to be taken off close observation and to thereby gain an opportunity to commit suicide. J.A. at 81 (McCrary Dep.); *see also* J.A. at 99 (McCrary Dep.) ("Well, a lot of times inmates are not truthful about things that are going on with them, so it doesn't surprise me that, in this instance, that maybe that same kind of thing was happening.").

McCrary testified at length about the ways in which his evaluation of Montgomery's mental status would have been improved by consultation with other sources in order to corroborate Montgomery's assertion that he was feeling fine and that he was not being threatened by other inmates. In his deposition, McCrary acknowledged (1) that reviewing the results of the battery of psychological tests administered to Montgomery on February 27, 1995 in conjunction with his progress note of March 2, 1995 would have heightened his awareness that Montgomery was at risk of committing suicide, J.A. at 83; (2) that, had he reviewed Montgomery's medical file prior to releasing him from close observation, he would have known that Montgomery had confided in Howell about being labeled a "snitch" and that Montgomery was, therefore, lying to him about his fear of the other inmates; (3) *with this information, he would have recommended that Montgomery be taken off of close observational status and placed in protective custody, as opposed to being sent back to*

directly, I said, Are you being pressed by the other inmates? I asked him that question directly, and he — only thing he said to me — now, these are his words — he said, *There's some shit going on up here.* That's all he said with regard to that, he didn't say anything else. And then I went on ahead to assess his mental status.

***

Q:  At that time what did you think, in your opinion, based on your experiences in the prison, and, again, with inmates, was the reason for the commotion; what do you think they were agitated about?

A:  Well, I did ask Mr. Montgomery was he being pressed and meant, you know, was he having problems with the other inmates, have the other inmates threatened him, and, of course, the other inmates could threaten another inmate for a variety of reasons. I didn't know what particularly was going on, but I just had — *and I felt that it was something going on between him and the other men on the block.*

Q:  They didn't like him?

A:  *They didn't like him for some reason, yes.*

J.A. at 93, 96 (emphases added). When asked to describe the commotion on the floor when he went to visit Montgomery, McCrary stated that "it seemed like the whole block was just sort of in an uproar. It seemed like noise was not just coming from one or two men in a couple adjacent cells, it just seemed like a whole block that the inmates were just being verbally agitated and were making a lot of noise. And as I was talking to Mr. Montgomery, *so I just thought maybe there's something else going on up here . . . .*" J.A. at 94-95 (emphasis added). Indeed, McCrary reported that the inmates "were yelling" and that he "had to kind of get closer to the

door to hear what Mr. Montgomery was saying, that's how loud the noise was." *Id.*

McCrary's testimony reveals that, because of the "uproar," the unusual amount of "noise and racket," and the "yelling" coming from the cellblock when he went to visit Montgomery, he "had a suspicion" that "something was going on between him and the other men on the block," and that he perceived that the other inmates "didn't like" Montgomery for some reason. Although it is true that Montgomery did not directly inform McCrary that he had been labeled a "snitch" and felt threatened, neither did he deny it. Instead, he informed McCrary that, "*[t]here's some shit going on up here*," indicating that he was, in fact, experiencing some difficulty with the other prisoners, although he apparently declined to elaborate further on the nature of the difficulty.[4]

In light of McCrary's admitted suspicion on March 2, 1995 that "something was going on between [Montgomery] and the other men on the block" and his conclusion that Montgomery was suicidal enough to be placed under close observation, we must conclude that McCrary subjectively perceived the risk of serious harm to Montgomery on March 3, 1995, including the fact that Montgomery's mental state was affected by the other inmates' dislike for him. McCrary cannot escape a finding of his subjective knowledge of risk just because he "declined to confirm inferences of risk," namely that Montgomery felt threatened by other prisoners, "that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

---

[4] McCrary recognized that Montgomery may have been reluctant to explain to him the situation with the other inmates on March 2, 1995, because the inmates in adjacent cells could overhear their conversation. J.A. at 97 (McCrary Dep.).

**(3) Evidence demonstrating that McCrary disregarded the risk of serious harm**

Even though, on the facts alleged, McCrary perceived a substantial risk of serious harm to Montgomery on the morning of March 3, 1995, McCrary may still prevail if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. In other words, if McCrary was not "failing to treat" Montgomery, or "doing less than [his] training indicated was necessary," *Williams*, 186 F.3d at 692, when he reevaluated Montgomery on March 3, 1995, then he cannot be said to have consciously disregarded the risk of serious harm.

Comstock asserts, and McCrary admitted in his deposition testimony, that, when making the decision to send Montgomery back to his cell, McCrary did not (1) review the battery of psychological tests administered to Montgomery on February 27, 1995, J.A. at 81; (2) review Montgomery's medical records or institutional file, and therefore did not read Howell's progress note indicating that Montgomery had been labeled a snitch, J.A. at 85; (3) speak to the resident officer who had referred Montgomery for a psychological consultation, J.A. at 86; (4) speak with the prison guards who daily observed Montgomery, J.A. at 87; (5) check the log book entries kept by the RGC control center or Top 6 where Montgomery was housed, J.A. at 92, which noted that Montgomery told a prison guard that "they are going to kill him," J.A. at 105, and that he did not want yard time and did not want to shower, J.A. at 106; or (6) speak with other two psychologists who had met with Montgomery previously, J.A. at 90. Plaintiff also claims that McCrary did not ensure that the Outpatient Mental Health Team conducted an evaluation of Montgomery, as McCrary had ordered only the day before.

Comstock further alleges that McCrary's conduct violated the Department of Corrections policy directive regarding suicide prevention in several ways: (1) he failed to review the custody staff referral form CHX-212 or, alternatively, speak with the custody officers who referred Montgomery for