NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0197n.06
Case No. 21-2739

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| SHERRY L. VANNORTWICK, in her capacity as the Personal Representative of the Estate of Claude Stevens, | ) ) ) ) | **FILED**<br>May 12, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) |  |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| ANTHONY STEWART, et al., | ) ) |  |
| Defendants, | ) ) |  |
| DR. VINDHYA JAYAWARDENA, | ) ) |  |
| Defendant-Appellee. | ) ) |  |

Before: COLE, CLAY, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Claude Stevens was a state prisoner who passed away from kidney failure after his catheter dislodged and he couldn't receive his regular dialysis. His estate sued his prison doctor for deliberate indifference under the Eighth Amendment, and the district court granted summary judgment to the doctor. We affirm.

I.

Before his death, Claude Stevens was a state prisoner in the custody of the Michigan Department of Corrections. He suffered many ailments, including gastroesophageal reflux disease (GERD) and kidney failure. To treat his kidney problems, Stevens received dialysis on Mondays,

Wednesdays, and Fridays. At times, he experienced complications like high potassium levels—called hyperkalemia—which can occur if dialysis doesn't filter the system well. Hyperkalemia can cause cardiac arrest or even death.

Stevens had a permanent catheter to assist with dialysis. But one Saturday, his catheter dislodged. Other inmates alerted nurse Larry Marshall about this early on Monday morning, and Marshall saw Stevens in his office. Without the catheter in place, though, Stevens couldn't receive dialysis that day. So Marshall had Stevens's blood drawn to make sure various blood chemical levels were stable. And Marshall ordered the results "stat," meaning they'd arrive within several hours.

Between 10 and 10:40 a.m. on Monday morning, Stevens's regular doctor—Dr. Vindhya Jayawardena—heard about Stevens's dislodged catheter and missed dialysis.[1] At 10:42 a.m., Dr. Jayawardena completed the paperwork to request a catheter replacement, which was scheduled for the next morning. And wanting to evaluate Stevens herself, she set an appointment with him for after 1 p.m. on Monday.

During their visit, Stevens told Dr. Jayawardena that he had been experiencing stomach pains since Saturday night, when he ate rice and shredded beef for dinner. Sure enough, she noted that he had nausea, abdominal tenderness, bloating, and was burping. But she found he otherwise seemed stable and was standing and talking. So she suspected a GERD flareup, prescribed an acid-reflux medication, and sent Stevens back to his cell.

---

[1] Dr. Jayawardena regularly treated Stevens's ailments, including his kidney failure and episodes of high potassium. She worked for Corizon—a healthcare group that the Michigan Department of Corrections contracted with to provide services to inmates.

After her evaluation, Dr. Jayawardena "sign[ed] out" Stevens's care to one of her subordinates—nurse practitioner Francis Awosika. R. 143, Pg. ID 2338. She called Awosika and told him to look out for the labs that were to arrive within hours.

Sometime after 2:30 p.m., Stevens started vomiting dark material that looked like "feces." R. 142-13, Pg. ID 2148, 2180. No one told Dr. Jayawardena. Meanwhile, a couple hours after that, Stevens's lab results arrived unnoticed to a prison fax machine. Dr. Jayawardena, who normally leaves around 5 p.m. at the latest, never saw the faxed results.

Stevens was taken to the prison healthcare unit around 7 p.m. Around that time, someone alerted Awosika about Stevens's lab results—his potassium levels were far over the safe range. Awosika immediately called for an ambulance. Sadly, Stevens passed away about two hours later.

Sherry VanNortwick, Stevens's personal representative, sued under 42 U.S.C. § 1983, claiming deliberate indifference to his medical needs in violation of the Eighth Amendment. The district court granted summary judgment for most defendants, and the parties stipulated to the dismissal of all others. Stevens's estate (Stevens) appeals only his claim against Dr. Jayawardena.

## II.

A prison official violates the Eighth Amendment when he is deliberately indifferent to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A deliberate-indifference claim has both objective and subjective components.

The objective component asks whether the inmate suffered from a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). This means either a doctor diagnosed a condition as needing treatment or it was so obvious that even a layperson would know the condition needed care. *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).

The subjective component asks about the official's state of mind. *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018). To ensure the official acted with the required level of culpability, the prisoner must establish that the official (1) was aware of facts from which she could infer a substantial risk of serious harm to the prisoner's health; (2) in fact drew that inference; and (3) "consciously disregarded" the substantial risk. *Id.* at 736, 738. When an inmate challenges the adequacy of care, instead of a lack of care entirely, we are "generally reluctant to second guess medical judgments." *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018) (citation omitted). Simply put, a negligent misdiagnosis is not enough. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Estelle*, 429 U.S. at 106). "The doctor must have *consciously* exposed the patient to an *excessive* risk of *serious* harm." *Rhinehart*, 894 F.3d at 738–39 (cleaned up).

Even if Stevens could show that he has met his burden with regard to the objective component, his case fails at the subjective prong.

Stevens first argues that Dr. Jayawardena must have inferred a substantial risk of harm from hyperkalemia because Stevens's medical history included previous episodes of hyperkalemia, even when he didn't miss dialysis. So, Stevens says, Dr. Jayawardena should have sent him to the hospital immediately after discovering that he had been feeling sick since Saturday's dinner and didn't receive dialysis on Monday morning.

True, Dr. Jayawardena knew of Stevens's long- and short-term histories. But there is no evidence that Dr. Jayawardena "consciously disregarded" a substantial risk of serious harm from these histories. *Id.* at 736. Quite the opposite. First, Dr. Jayawardena requested a new catheter, once she heard it had been dislodged, so that he could get dialysis again as soon as possible. Then, on her own initiative, she personally evaluated Stevens and determined that none of his symptoms called for immediate hospitalization. She provided a prescription for his symptoms—symptoms

that tracked another of his regular diseases (GERD). Plus, Dr. Jayawardena knew his lab results were coming—lab results that would reveal if he also needed hyperkalemia treatment, including specific medication or hospitalization. And something similar had happened before—Stevens refused dialysis, Dr. Jayawardena ordered rushed labs to test for hyperkalemia, and there's no indication he ended up in the hospital. Finally, no one alerted Dr. Jayawardena that Stevens's condition worsened after she saw him.

Given these facts, Dr. Jayawardena was not providing treatment "so cursory as to amount to no treatment at all." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (citation omitted). Responding with care that aligned with the symptoms she saw and history she knew about shows that she wasn't *consciously* disregarding a substantial risk of serious harm. *Rhinehart*, 894 F.3d at 738–39; *see Comstock*, 273 F.3d at 703 ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.").

Next, Stevens argues that Dr. Jayawardena consciously disregarded a substantial risk by not checking for the lab results before leaving that day. But Dr. Jayawardena signed Stevens out to nurse practitioner Awosika at 1:43 p.m. Thus, it was Awosika's responsibility to watch for the lab results. In fact, Dr. Jayawardena specifically asked Awosika to look out for them. And Awosika recalls Dr. Jayawardena alerting him to the incoming labs since "she may not be there when the lab results come in." R. 142-2, Pg. ID 1671. So Dr. Jayawardena took steps toward treating Stevens's observable symptoms (GERD), diagnosing another problem from which Stevens might be suffering (hyperkalemia), and making sure the next medical provider had all the

relevant information.[2]  Those steps show that she did not consciously disregard a substantial risk to Stevens.

Finally, Stevens implies that Dr. Jayawardena should have known his nausea was a symptom of hyperkalemia rather than GERD.  But Stevens concedes that the only way to diagnose hyperkalemia for sure is through a blood test—which Dr. Jayawardena knew was coming and told Awosika about.  What's more, nausea is a symptom of many things.  Given that, Stevens's history of gastrointestinal problems, and what he had eaten, Dr. Jayawardena thought he more likely had GERD.  Assuming nausea is also a symptom of hyperkalemia, it would be negligence at most if Dr. Jayawardena did not know this.  *See Comstock*, 273 F.3d at 703; *Murray v. Dep't of Corr.*, 29 F.4th 779, 787 (6th Cir. 2022) (noting that medical mistakes are not enough).  And again, most importantly, Dr. Jayawardena told Awosika about the incoming results instead of consciously disregarding Stevens's potential harm.  In sum, Stevens's "disagreement with" his diagnosis and treatment "does not rise to the level of an Eighth Amendment violation."  *Rhinehart*, 894 F.3d at 740 (citation omitted).[3]

\*        \*        \*

Dr. Jayawardena treated a patient who was walking and talking, who didn't appear to need immediate hospitalization, and who was awaiting lab results that would confirm if he did need serious treatment.  After seeing that patient, she handed him off to her subordinate, who could act on the results.  Taken together, Dr. Jayawardena is entitled to summary judgment.  We affirm.

---

[2] Just because Awosika also had other patients to deal with doesn't create a genuine dispute of material fact about Dr. Jayawardena handing over Stevens to Awosika.  Dr. Jayawardena and Awosika both knew that Awosika would be the only provider at the prison after a certain point that day.  That would make him responsible for any patient who needed immediate care.

[3] It's unclear if Stevens also argues that the serious medical need was his kidney failure rather than hyperkalemia.  But even if he does, his claim still fails on the subjective prong.  Dr. Jayawardena was regularly treating his ongoing kidney failure with dialysis three times a week.  And the catheter outpatient procedure was set for as soon as possible.  There is no dispute that sometimes patients miss a day of dialysis.  His ongoing and rescheduled dialyses were not "so woefully inadequate as to amount to no treatment at all."  *Richmond*, 885 F.3d at 939 (citation omitted).