NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0205n.06
Filed: March 20, 2007

Nos. 06-3135, 06-3136, 06-3137, 06-3138, 06-3139

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK C. HOLLENBAUGH, Administrator of the Estate of Joel Hollenbaugh, deceased, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| THOMAS G. MAURER, | ) ) | |
| Defendant, | ) ) | |
| SCOTT ROTOLO, | ) ) | |
| Defendant-Appellant, | ) ) | |
| and | ) ) | |
| LOUIS JOHNS, DOUG JOHNSON, NANCY OTT, and MIKE BUTLER, | ) ) ) | |
| Defendants-Appellants. | ) | |

_____

Before: MERRITT, DAUGHTREY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Mark C. Hollenbaugh, administrator of the estate of Joel Hollenbaugh, brought this action pursuant to 42 U.S.C. § 1983 against Wooster Police Officer Scott Rotolo and Thomas G. Maurer, Sheriff of Wayne County, Ohio, and some of his officers for events relating to Joel Hollenbaugh's death. Plaintiff alleged that defendants violated Joel Hollenbaugh's Fifth, Eighth,

Case Nos. 06-3135, 06-3136, 06-3137, 06-3138, 06-3139
*Hollenbaugh v. Maurer, et al.*

and Fourteenth Amendment rights by their deliberate indifference in failing to provide the necessary

medical care during Hollenbaugh's arrest and detention on May 27, 2003. Plaintiff further asserted

various state law claims. On November 10, 2005, the district court granted summary judgment in

favor of defendants with regard to Hollenbaugh's § 1983 claims against Wayne County, Ohio, all

defendants in their official capacities, and defendant Schuler in her individual capacity. The district

court denied defendants' summary judgment motion regarding Hollenbaugh's § 1983 individual

capacity claims against defendants Rotolo, Ott, Butler, Johns, and Johnson. These defendants have

timely appealed.

For the reasons set forth below, we affirm.

I.

At approximately 5:08 p.m. on May 27, 2003, Joel Hollenbaugh and Sharon Brewer were

involved in a minor traffic accident in Wooster, Ohio.[1] Defendant police officer Scott Rotolo arrived

on the scene at 5:16 p.m. Rotolo observed Brewer in the driver-seat and Hollenbaugh in the

passenger-seat of the U-Haul vehicle that they were driving, although the driver of the other vehicle

involved in the accident told Rotolo that she believed that Hollenbaugh had been driving the U-Haul

at the time of the accident and thereafter the two switched seats. During her description of the

accident, Brewer maintained that she had been driving. Rotolo suspected that he smelled alcohol

in the truck, but was not sure because there was an overbearing smell of body odor. Rotolo was

---

[1]The facts in this case are disputed. In this interlocutory appeal, we are obligated to construe the facts in the light most favorable to Hollenbaugh. We set forth the record accordingly. *Johnson v. City of Detroit*, 446 F.3d 614, 618 (6th Cir. 2006).

unsure about the source of the odors, and he allowed Hollenbaugh and Brewer to leave the scene.

Approximately one hour later, Officer Rotolo visited Brewer's residence to continue his investigation. According to Rotolo, after Brewer confirmed that Hollenbaugh was the driver of the vehicle, he asked to locate Hollenbaugh and was told that he was "indisposed." He and another officer went upstairs to the bathroom. Hollenbaugh was there and told Rotolo that "he was sick and had diarrhea." According to Crystal Brewer, the daughter of Sharon Brewer who was present in the apartment, Hollenbaugh could be clearly heard vomiting prior to his exiting the bathroom and, upon his exit, was sweating badly and "very pale in the face."

Rotolo brought Hollenbaugh outside of the building where Hollenbaugh informed Rotolo that "he didn't feel good and he had the flu" and again said that he had diarrhea. According to Crystal Brewer, Hollenbaugh grabbed his chest and stated that his chest hurt while breathing deeply. Rotolo performed several field sobriety tests on Hollenbaugh. Hollenbaugh allegedly stated that he had consumed a couple of beers, and he appeared to be swaying and could not keep his balance. According to Rotolo, Hollenbaugh did not fall, but at one point needed to "sit down as he had diarrhea," stated that his "head was pounding," and that he was sick. Rotolo admitted that Hollenbaugh stated "three or four times" that he was ill.

Rotolo then arrested Hollenbaugh and transported him to the Wayne County Jail. According to Rotolo, Hollenbaugh rested across the rear seat of the cruiser, leaning against the door during transport. Upon arriving at the jail at approximately 6:30 p.m., Rotolo and another Officer, "Goon," escorted Hollenbaugh to the booking counter. According to defendants, approximately twenty

minutes passed between the time that Rotolo first escorted Hollenbaugh to the booking counter and the time that he was eventually carried to the jail's blood alcohol testing room ("BAC room"). Deputy Patricia Schluer was behind the booking counter when Hollenbaugh arrived with Rotolo. Schuler proceeded to ask Hollenbaugh the standard booking questions. Schuler had no further contact with Hollenbaugh. Captain Douglas Johnson, the jail administrator, had limited contact with Hollenbaugh at this time. Johnson stopped by the jail around 6:15 p.m. to wish defendant Nancy Ott a happy retirement and left at approximately 6:45 p.m.

Deputy Schuler and defendants Johnson, Ott, and Butler were all at the booking counter when Rotolo brought Hollenbaugh in. According to Butler, when Butler patted Hollenbaugh down, Hollenbaugh again stated that he had the flu, was going to be sick, and wanted to go to the hospital, and he had slurred speech. Johnson also recalled Hollenbaugh stating that he had the flu and was going to be sick. Kelsey Amos, who was detained in the jail holding cell during these events, claims that when Hollenbaugh was first brought in, Hollenbaugh was having trouble standing and that Rotolo was supporting him. Amos also stated that Hollenbaugh passed out or slumped down a couple of times, and Rotolo and two other sheriff's deputies supported him at different times by holding his arms. Butler stated that Hollenbaugh asked to sit down and that Butler assisted him to prevent him from falling. At some point, Ott brought out a waste can and placed it before Hollenbaugh. Butler relayed Hollenbaugh's answers to the booking questions to Schuler. Defendants claim that Hollenbaugh did not respond to the majority of the questions, including those relating to his medical history.

4

While Schuler questioned Hollenbaugh, two events occurred: (1) defendant Louis Johns entered the room, and (2) Ott left to check the women's shower room. Upon returning to the booking room, Ott observed Hollenbaugh lying flat on his back on the floor and heard him state that "[m]y chest hurts." Ott then attempted to take Hollenbaugh's blood pressure three times using a blood-pressure cuff. Defendants claim that each time, Hollenbaugh thwarted the blood-pressure reading by flailing his arm and rolling over, thus causing an "error" reading. Ott gave conflicting testimony as to whether Hollenbaugh's eyes were open or closed. On the third attempt at a blood-pressure reading, Johns helped keep Hollenbaugh steady on the ground so that he could not roll over, but for unknown reasons, the machine again read error. At this point, Ott contends that Hollenbaugh was awake but incoherent. Following this failed third attempt, Butler attempted to obtain Hollenbaugh's pulse manually by placing two fingers on Hollenbaugh's carotid artery. Butler claimed that Hollenbaugh kept pinching his neck down to interrupt the process, but that he "guesstimate[d]" that he obtained a pulse for about five seconds.

According to defendants, Butler and Johns then carried Hollenbaugh into the BAC room so that Officers Rotolo and Goon could administer a breath test. Detainee Amos alleges that the officers dragged Hollenbaugh, feet dangling, past his cell. Rotolo stated that "two male deputies . . . lift[ed] him off the ground and carr[ied] him." Defendants placed Hollenbaugh in a chair in the BAC room. According to Butler, Hollenbaugh slumped down with his head on his hand. Eventually, he slumped down with his feet on Goon's chair. Goon knocked his feet off, and Hollenbaugh fell to the floor, hitting his head on the wall. In his deposition, Rotolo gave conflicting

testimony with regard to whether Hollenbaugh remained conscious. However, in his initial report, Rotolo described Hollenbaugh as "going in and out of consciousness." Butler stated that Hollenbaugh's eyes were intermittently closed. According to Rotolo, Hollenbaugh did not respond to the breath test instructions, and the officers recorded this as a refusal to submit to the test.

At approximately 6:50 p.m., Butler and Johns carried Hollenbaugh to holding cell 1-A. Rotolo and Goon departed; neither they nor Johnson had further contact with Hollenbaugh. Prior to leaving, Johnson recommended that Hollenbaugh be placed on a fifteen-minute observation schedule. There were only a few more interactions with Hollenbaugh. First, according to Butler, three to five minutes after placing him in the holding cell, Butler and Johns decided to attempt to test Hollenbaugh's blood pressure once more. Butler claims, however, that upon entering the cell, Hollenbaugh smiled at him, and he decided not to attempt the test. Johns apparently did not have any further contact with Hollenbaugh, but Butler claims to have checked on him three more times. At approximately 10:00 p.m., Butler claims to have entered the cell and witnessed Hollenbaugh sitting up on the middle bunk. According to Butler, Hollenbaugh told him that he thought he had food poisoning; Butler advised him that he believed Hollenbaugh was intoxicated. Twice more between 10:00 p.m. and 12:00 a.m., Butler saw Hollenbaugh when Butler brought inmates to the cell. Both times, Hollenbaugh was lying on his back.

Ott also testified that she observed Hollenbaugh three times after he was put in the holding cell. At 7:15 p.m., she saw Hollenbaugh lying on his side. Sometime between 8:00 and 9:15 p.m., she entered the cell to give Hollenbaugh his citations. Ott stated that he was lying on his back with

6

his arm over his eyes. Then, at some point between 9:00 and 9:30 p.m., Ott heard someone vomiting in the cell and calling. When she entered, she found Hollenbaugh seated in front of the toilet. Hollenbaugh stated that he thought he had food poisoning and needed to go to the hospital. Ott replied that he most likely had alcohol poisoning, but claims that she meant it facetiously. She then left and had no further contact with Hollenbaugh.

The inmates in the cell with Hollenbaugh testified that he vomited, including blood, throughout the evening, and that they unsuccessfully tried to get the officers' attention by banging for periods of time on the cell bars. Detainee Amos testified further that Hollenbaugh said that his shoulder hurt, though there is no evidence that Amos reported this to any of defendants. Amos testified that he attempted to get attention for Hollenbaugh and told certain unnamed officers that Hollenbaugh was sick and needed help. According to Amos, when the officers entered, they laughed and eventually lowered the blinds over the window to the cell.

The following morning, one of the Wayne County Jail personnel discovered that Hollenbaugh was dead. The coroner's report states that Hollenbaugh died sometime between 11:30 p.m. and 12:00 a.m. from cardiac arrest caused by coronary artery disease.

Mark Hollenbaugh brought this § 1983 action on behalf of Joel Hollenbaugh's estate, alleging that if defendants had sought medical treatment for Hollenbaugh, he would not have died. He also claims that defendants violated Hollenbaugh's constitutional rights by acting with deliberate indifference in their failure to seek such care. Thirteen defendants were identified in Hollenbaugh's initial complaint, and of these, six defendants were sued in their individual and official capacities.

7

In November 2005, the district court granted summary judgment in favor of Wayne County, Ohio, the named defendants in their official capacities, and defendant Schuler in her official capacity. The district court denied the motion with regard to defendants Rotolo, Ott, Butler, Johns, and Johnson in their individual capacities, holding that Hollenbaugh submitted sufficient facts to overcome defendants' asserted defense of qualified immunity, at least for purposes of summary judgment. Whether defendants Rotolo, Ott, Butler, Johns, and Johnson are entitled to qualified immunity are the only issues appealed.

## II.

"A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291, but only 'to the extent that it turns on an issue of law.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "[T]his court can consider whether 'the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law.'" *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)).

In order to prevail in an action brought pursuant to § 1983, a "plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff (or decedent) of a right secured by the Constitution or other federal laws." *Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir. 1995). The qualified immunity doctrine provides that "government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Walsh v. Cuyahoga Cty.*, 424 F.3d 510, 513 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity shields officials so "long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)), *cert. denied sub nom Hutchins v. Myers*, – U.S. –, 126 S. Ct. 300 (2006).

In this case, there is no question that defendants acted under color of state law. The question is whether Hollenbaugh has submitted "facts which, when taken in the light most favorable to h[im], show that the [officers'] conduct violated a constitutionally protected right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001)). The district court correctly cited the tripartite test we utilize in assessing claims of qualified immunity. "First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)). We have since compressed the test into two parts in application. *See Estate of Carter*, 408 F.3d at 310 n.2 (noting that if a right is "clearly established" it often sufficiently implies that its violation is objectively unreasonable, thereby necessitating only a two-part test); *Garretson v. City of Madison Hts.*, 407 F.3d 789, 796 (6th Cir. 2005). First, we determine whether plaintiff has documented facts

which, when taken in the light most favorable to the plaintiff, show that the alleged conduct violated a constitutionally protected right. *Garretson*, 407 F.3d at 796 (citing *Comstock*, 273 F.3d at 702. "If this threshold question is answered affirmatively, we then address whether such right was clearly established at the time of the violation." *Id.*

A.      *Constitutionally protected right.*

The district court correctly determined that Hollenbaugh's claims of improper denial of medical care fell under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).[2] Thus, plaintiff alleged that individual officers violated his Fourteenth Amendment rights by exhibiting a deliberate indifference to Hollenbaugh's medical needs while he was detained pre-trial in the Wayne County jail.

A claim of deliberate indifference to medical needs has both objective and subjective components. *Garretson*, 407 F.3d at 797 (citing *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001)). "The objective component requires a showing that the alleged deprivation is sufficiently serious – that [he] was incarcerated under conditions posing a substantial risk of serious harm." *Id.* (internal quotation and citations omitted). Here, Hollenbaugh's death was the serious harm resulting from defendants' alleged deprivation. *See Estate of Carter*, 408 F.3d at 311-12 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899-900 (6th Cir. 2004) ("[I]t is sufficient to show that

_____

[2]Although plaintiff originally asserted claims under the Fifth, Eighth, and Fourteenth Amendments, the district court held that, because Hollenbaugh was a pre-trial detainee, the claims were properly analyzed pursuant to the Fourteenth Amendment.  Plaintiff has not challenged this determination on appeal.

[Hollenbaugh] actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.'"))

Then, plaintiff "must also show that the officers subjectively had 'a sufficiently culpable state of mind in denying [Hollenbaugh] medical care.'" *Garretson*, 407 F.3d at 797 (quoting *Blackmore*, 390 F.3d at 895). Deliberate indifference exceeds the showing for mere negligence, requiring that the officers "knew of and disregarded a substantial risk of serious harm to [Hollenbaugh's] health and safety." *Garretson*, 407 F.3d at 797 (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001)). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In short, plaintiff must allege facts to support a finding that the officers knew that Hollenbaugh had a serious medical condition. *See Watkins*, 273 F.3d at 686.

The subjective component of the analysis must be addressed for each officer individually. *Garretson*, 407 F.3d at 797. Plaintiff contends that defendants – Rotolo, Johns, Johnson, Butler, and Ott – each had sufficient indication of Hollenbaugh's serious medical condition that their failure to obtain medical treatment for him constituted deliberate indifference. *See Taylor v. Franklin Cty., Ky.*, 104 F. App'x 531, 543 (6th Cir. 2004) ("Plaintiff set forth sufficient facts from which a trier of fact could conclude that there was objective awareness as to the seriousness of Plaintiff's ailment, and a sufficient factual dispute as to whether Defendants . . . had the subjective knowledge that their acts or omissions amounted to deliberate indifference to Plaintiff's serious medical needs.")

11

As a group, defendants make the common argument that Hollenbaugh never stated that he had a heart condition, and, without this information, they could not have made the requisite connection that Hollenbaugh's condition posed a substantial risk of serious harm. The district court addressed defendants as a group, but clearly gave each individual consideration, as it separated out Officer Schuler (the booking agent), holding that she was entitled to qualified immunity based on her limited contact with Hollenbaugh. We will address each remaining defendant in turn.

1.      Scott Rotolo.

The district court concluded, and we agree, that plaintiff submitted sufficient facts to overcome Rotolo's qualified immunity defense at the summary judgment stage. First, Rotolo noticed an overbearing smell of body odor coming from the U-Haul at the initial stop. When he later approached Hollenbaugh in the bathroom, Hollenbaugh stated that he did not feel well and had the flu. Rotolo, accompanying Hollenbaugh outside, again smelled the body odor and noticed that Hollenbaugh was swaying. Several times during the field sobriety test, Hollenbaugh informed Rotolo that "he didn't feel good and he had the flu" and again said that he had diarrhea. According to Crystal Brewer, Hollenbaugh grabbed his chest and stated that his chest hurt while breathing deeply. According to Rotolo, Hollenbaugh did not fall, but at one point needed to "sit down as he had diarrhea," stated that his "head was pounding," and stated that he was sick. Rotolo admitted that Hollenbaugh stated "three or four times" that he was sick.

During the transport to the jail, Rotolo stated that Hollenbaugh rested across the rear seat of the cruiser, leaning against the door during transport. Kelsey Amos claims that Hollenbaugh was

having trouble standing, and Rotolo was supporting him during the booking. Amos also stated that

Hollenbaugh passed out or slumped down a couple of times and that Rotolo and two other sheriff's

deputies supported him at different times by holding his arms. Although Rotolo contends in his brief

that he was unaware of Hollenbaugh's interactions with other officers because he was completing

paperwork, his testimony arguably belies this assertion, as he was aware of the garbage can, the

attempts to take a blood pressure reading, and Hollenbaugh's slumping and fall from the chair.

Rotolo knew that Hollenbaugh was dragged and/or carried to the BAC room, stating that "two male

deputies . . . lift[ed] him off the ground and carr[ied] him." Butler's testimony places Rotolo in the

small BAC room with Hollenbaugh when he slumped down with his head on his hand and,

ultimately, fell to the floor, hitting his head on the wall. In his deposition, Rotolo gave conflicting

testimony as to whether Hollenbaugh remained conscious, but described him as "going in and out

of consciousness" in his initial report. According to Rotolo, Hollenbaugh did not respond to the

breath test instructions, and the officers recorded this as a refusal to submit to the test.

Rotolo asserts in his brief that the "lack of proof of knowledge level of Rotolo" requires this

court to conclude that the district court erred. Rotolo is mistaken. "In most cases in which the

defendant is alleged to have failed to provide treatment, there is no testimony about what inferences

the defendant in fact drew. Nonetheless, in those cases, a genuine issue of material fact as to

deliberate indifference can be based on a strong showing on the objective component." *Estate of*

*Carter*, 408 F.3d at 313 (holding officer not entitled to qualified immunity when directly informed

by decedent that she was in distress and later informed by another officer that decedent was

13

experiencing chest pains, had not taken her "heart" medication, and needed to go to the hospital).

We agree with the district court that, based on the proffered evidence, and viewing these facts and reasonable inferences in the light most favorable to Hollenbaugh, plaintiff has established a genuine issue of material fact regarding whether Rotolo was aware of his serious medical condition. *See Garretson*, 407 F.3d at 798.

2.      Nancy Ott.

Captain Johnson and Deputies Ott and Butler were at the booking counter when Rotolo brought Hollenbaugh in. According to Butler, when Butler patted Hollenbaugh down, Hollenbaugh again stated that he had the flu, was going to be sick, wanted to go to the hospital, and had slurred speech. Plaintiff proffered testimony that, at this time, Hollenbaugh was having trouble standing and needed support, repeatedly stating that he had the flu and was going to be sick, passed out or slumped down a couple of times, and that Rotolo and two other sheriff's deputies supported him at different times by holding his arms.

When Ott returned to the booking room after checking the women's shower, she observed Hollenbaugh lying flat on his back on the floor and heard him state that "[m]y chest hurts." Ott then attempted to take Hollenbaugh's blood pressure three times using a blood-pressure cuff. Ott gave conflicting testimony as to whether Hollenbaugh's eyes were open or closed. On the third attempt at a blood-pressure reading, Johns helped keep Hollenbaugh steady on the floor so that he could not roll over, but for unknown reasons, the machine again read "error." At this point, Ott contends Hollenbaugh was awake but incoherent.

14

Ott also testified that she observed Hollenbaugh three times after he was put in the holding cell. At 7:15 p.m., she saw Hollenbaugh lying on his side. Sometime between 8:00 and 9:15 p.m., she entered the cell to give Hollenbaugh his citations. Ott stated that he was lying on his back with his arm over his eyes. Then, at some point between 9:00 and 9:30 p.m., Ott heard someone vomiting in the cell and calling. When she entered, she found Hollenbaugh seated in front of the toilet. Hollenbaugh stated that he thought he had food poisoning and he needed to go to the hospital. Ott admitted that she replied that he most likely had alcohol poisoning, but claims she meant it facetiously. Further, plaintiff proffered testimony that Hollenbaugh vomited, including blood, throughout the evening, and his fellow inmates unsuccessfully tried to get the officers' attention by banging for periods of time in the cell, telling certain unnamed officers that Hollenbaugh was sick and needed help. According to Amos, when the officers did enter, they laughed and eventually lowered the blinds over the window to the cell.

As with defendant Rotolo, we agree with the district court that, based on the proffered evidence, and viewing these facts and reasonable inferences in the light most favorable to Hollenbaugh, plaintiff has established a genuine issue of material fact regarding whether Ott was aware of a serious medical condition. *See Garretson*, 407 F.3d at 798.

3.     Mike Butler

In addition to the incident at the booking counter, Butler assisted with Ott's attempt to take a blood pressure reading of Hollenbaugh. Following the failed third attempt, Butler attempted to obtain Hollenbaugh's pulse manually by placing two fingers on Hollenbaugh's carotid artery. Butler

15

claimed that Hollenbaugh kept pinching his neck down to interrupt the process, but that he "guesstimate[d]" that he obtained a pulse for about five seconds.

Butler admits that he and Johns then carried Hollenbaugh into the BAC room so that Officers Rotolo and Goon could administer a breath test, and plaintiff proffered testimony that the officers dragged Hollenbaugh, feet dangling. Once in the BAC room, Butler testified that Hollenbaugh slumped down with his head on his hand, eventually slumping down with his feet on Goon's chair. Butler further witnessed Hollenbaugh falling and hitting his head and stated that his eyes were intermittently closed.

At approximately 6:50 p.m., Butler and Johns carried Hollenbaugh to holding cell 1-A. According to Butler, three to five minutes after placing him in the holding cell, Butler and Johns decided to attempt to test Hollenbaugh's blood pressure once more but never did so. At approximately 10:00 p.m., Butler claims to have entered the cell and witnessed Hollenbaugh sitting up on the middle bunk. According to Butler, Hollenbaugh told him that he thought he had food poisoning; Butler advised him that he believed he was intoxicated. Twice more between 10:00 p.m. and 12:00 a.m., Butler saw Hollenbaugh when he brought two more inmates to the cell. Both times, Hollenbaugh was lying on his back. Finally, as recounted above, plaintiff proffered testimony that Hollenbaugh's fellow inmates communicated some degree of alarm to the officers and were not heeded.

Accordingly, we agree with the district court that, based on the proffered evidence and viewing these facts and reasonable inferences in the light most favorable to Hollenbaugh, plaintiff

16

has established a genuine issue of material fact regarding whether Butler was aware of a serious medical condition.

### 4. Louis Johns.

Plaintiff's allegations and supporting testimony likewise place Johns in the booking room while Hollenbaugh was being questioned, assisting in the attempt to obtain a blood pressure reading, supporting Hollenbaugh in the BAC room, carrying Hollenbaugh to the holding cell, and re-entering Hollenbaugh's cell with the intent of testing his blood pressure. For the reasons stated above, viewing these facts and reasonable inferences in the light most favorable to Hollenbaugh, plaintiff has established a genuine issue of material fact regarding whether Johns was aware of a serious medical condition.

### 5. Doug Johnson.

Plaintiff's allegations and supporting testimony place Johnson, the captain and jail administrator, at the booking counter during Hollenbaugh's arrival, and leaving at approximately 6:45 p.m. He observed Hollenbaugh enter the booking room and characterized his behavior as "lethargic" and "stumbling." He heard Hollenbaugh talk and was present during the booking process, and, according to testimony proffered by plaintiff, would have witnessed Hollenbaugh being supported by the other officers and the blood pressure incident. Johnson recalled Hollenbaugh stating that he had the flu and was going to be sick, and the placement of the waste basket in front of Hollenbaugh. Prior to leaving, Johnson recommended that the other defendants put Hollenbaugh on a fifteen-minute observation schedule.

Undoubtedly, Johnson observed less than any of the other defendants did. Nevertheless, we conclude that "plaintiff set forth sufficient facts from which a trier of fact could conclude that there was objective awareness as to the seriousness of [Hollenbaugh]'s ailment, and a sufficient factual dispute as to whether [Johnson, the captain of the jail] . . . had the subjective knowledge that [his] acts or omissions amounted to deliberate indifference to [Hollenbaugh]'s serious medical needs." *Taylor*, 104 F. App'x at 543.

Although Johnson contends that his recommendation to place Hollenbaugh on a fifteen-minute observation schedule should not evidence anything more than a need for observation, the district court held, and we agree, that it did provide some evidence that Johnson drew an inference that a serious medical condition was present. "In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew. Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter*, 408 F.3d at 313 (holding that a jury would be entitled to draw the inference that the officer was aware of medical need based on officer's claims that he gave instruction that decedent was to go to the hospital).

Accordingly, we affirm the district court's disposition with respect to Captain Johnson.

B.    *Clearly Established Law.*

Having determined that a genuine issue of fact exists regarding the violation of Hollenbaugh's Fourteenth Amendment rights by defendants, we must next determine whether the constitutional right that was violated was clearly established. "Whether an official protected by

18

qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Rich v. City of Mayfield Hts.*, 955 F.2d 1092, 1094 (6th Cir. 1992) (internal citations and quotations omitted).

In the context of deliberate indifference, we have held that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Estate of Carter*, 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)). In 1992, we specifically stated "that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Id.* (quoting *Heflin v. Stewart Cty.*, 958 F.2d 709, 717 (6th Cir. 1992)). Thus, the right of Hollenbaugh not to be deprived of needed medical care because of deliberate indifference was clearly established.

III.

For the reasons stated above, the order of the district court is AFFIRMED.