Gregory J. ATKINS and Jeanette Atkins, Plaintiffs–Appellees,

v.

TOWNSHIP OF FLINT, a municipal corp., Flint Township Police Department, Sergeant Paul Green and Officer Charles Abdella, jointly and severally, Defendants–Appellants.

No. 03–1745.

United States Court of Appeals, Sixth Circuit.

April 9, 2004.

Joseph J. Ceglarek, II, Blum, Konheim, Southfield, MI, for Plaintiffs–Appellees.

Mary Massaron Ross, Plunkett & Cooney, Detroit, MI, for Defendants–Appellants.

Before KENNEDY, ROGERS, and COOK, Circuit Judges.

KENNEDY, Judge.

This case presents an appeal from the district court's order denying summary judgment in favor of Defendant–Appellants police officers Green and Abdella. Defendants argue that the district court erred when it denied them qualified immunity after finding that there were issues of fact as to whether they violated Mr. Atkins' constitutional rights (1) to be free of an arrest without probable cause and (2) not to be subject to excessive force. We **AFFIRM** on grounds somewhat different from the district court.

## BACKGROUND

This § 1983 action arose out of the warrantless arrest of Plaintiff Gregory Atkins in his home on the night of January 7, 2000. Shortly before 1:45 a.m., while in the recreation room in their basement, Mr. and Mrs. Atkins began arguing about something one of their daughters had done earlier that day. Each had consumed one or two twelve-ounce cans of beer that night. The argument was simply an oral one and absolutely no physical contact was made. At one point. Mr. Atkins called Mrs. Atkins "crazy" and told her that he would call 911 on her. Mr. Atkins did call 911. It is, however, unclear how that hap-

pened. The district court summarized the evidence as follows:

> Mr. Atkins proceeded to actually call 911 from the basement phone. He claims the call was made as a joke. He "just made a gesture, and didn't even expect the call to go through." Mr. Atkins thinks 911 is programmed into his phone, so he may have just hit one button. He doesn't remember exactly what happened, but admitted that a call to 911 was placed from his home. He hung up the phone quickly to prevent the call from being placed, and didn't expect the call to be connected, but realized it was when a 911 dispatcher immediately called back.

*Atkins v. Flint,* No. 02–73455, slip op. at 2 (E.D.Mich. May 12, 2003). Mr. Atkins picked up the phone when the dispatcher called. The dispatcher asked him if there was a problem. Mr. Atkins responded "I hit 911 but we didn't have a problem and that we didn't need any assistance or any police, there was nothing going on." Upon hearing this, the dispatcher asked if anyone else was at the house. Mr. Atkins stated that his wife and children were at home. The dispatcher asked to speak to Mrs. Atkins, who told the dispatcher that there was no problem. The dispatcher asked Mrs. Atkins if she and Mr. Atkins were fighting, and Mrs. Atkins indicated that they were not.

About five minutes after the 911 call ended, police officers, Defendants Abdella and Green, and Deputy Lang (who is not a defendant in this case), arrived at the Atkins' home.[1] The officers were admitted by one of the Atkins' teenage daughters. The police officers asked for Mr. and Mrs. Atkins to come upstairs from the basement to the foyer, which they did. Defendant Abdella explained that they were there because the police had received a domestic call. Mrs. Atkins responded that "everything was okay, it was just a misunderstanding." One of the officers replied that anytime the police receive a 911 call, they have to come to the home and make sure everything is okay. Mrs. Atkins stated that she "totally understood that and I appreciated them coming out because I know that there are situations where people do need help in cases like that, people hang up and they really do need help, but in this case that wasn't the case and I told him that." During this initial conversation, Mrs. and Mr. Atkins assured the police several times that neither of them needed help. Both Plaintiffs were smiling and appeared appreciative. Plaintiffs asked the police officers to leave since there was no problem to investigate. However, one of the officers responded that they could not leave until they were fully satisfied that there was no domestic dispute. At that point. Defendant Abdella asked to speak privately to Mrs. Atkins in the living room. Out of the presence of Mr. Atkins and in response to Defendant Abdella's question, Mrs. Atkins stated:

> ... no, there's no injuries, there's no-he has not touched me, we're not fighting, it was just a misunderstanding, I'm sorry you guys had to come out. And then he kept asking if he had ever threatened me or hit me. And I said no. And I said look at me. And I went with my shirt-I had my pajamas on and I said look at me, do you see any bruises, marks, is my hair out of place, do I look like I've been in fight?

*Atkins,* slip op. at 4. While this conversation was going on, Mr. Atkins remained in the foyer with Defendant Green and Depu-

---

**1.** It appears that the dispatcher never told the Atkins that she was sending officers to their home.

ty Lang. Mr. Atkins could hear his wife's end of the conversation with Defendant Abdella and apparently could also see her. When he heard and saw his wife pulling down the top of her pajamas to show Defendant Abdella her lack of bruises, Mr. Atkins asked Green and Lang if he could check on his wife.

The parties dispute what occurred thereafter. However, for the purposes of this qualified immunity appeal, Defendants concede the facts are as claimed by Plaintiffs. Mr. Atkins testified that after not getting a response, he proceeded to the living room and told his wife in a normal, conversational tone, "Jeanette, you don't have to do that, we've already showed them that—we've already showed them that there's nothing going and I'd appreciate it if you guys would leave." Mrs. Atkins testified that as Mr. Atkins came into the living room. he had one hand raised to tell her she did not have to pull down her pajamas. She also testified that she did not raise her arms or hands in front of her when he entered the room. Mr. Atkins testified that his wife did not put her hand up, nor did he push her hands away, as the officers claimed. Just after Mr. Atkins came into the living room and made the statement quoted above, Defendant Green came into the living room and stepped between Mr. and Mrs. Atkins, and pushed Mr. Atkins backwards into the family room.[2] Thereafter, Mrs. Atkins went to speak to Deputy Lang, who was still in the foyer.

Mr. Atkins testified that after the private conversation between his wife and Defendant Abdella in the living room, "everything came down to a lull to the point to where I think they were getting ready to leave, and rather than them leave empty-handed Abdella yelled out 'he grabbed my balls.'" Defendants Green and Abdella then "came at" Mr. Atkins while Deputy Lang turned his back to them. According to Mr. Atkins, Defendants did not tell him that he was under arrest or that they were trying to handcuff him, but simply attempted to wrestle him down. Mr. Atkins insisted that at the time of the incident, he did not know that Defendants were trying to handcuff him. He does appear to assume with the benefit of hindsight that that is what they were trying to do. Mr. Atkins was sprayed twice in the face with "OC"[3] spray without any warning. After the second spraying, Defendant Abdella struck him on the side of his left knee with a steel rod three times. After being sprayed again, and after his daughter asked him to stop resisting, Mr. Atkins agreed to be handcuffed. Mr. Atkins testified that, despite the officers' testimony and a police report to the contrary, he never touched Defendant Green. Green claimed he was choked when he came between Mr. and Mrs. Atkins. Mrs. Atkins substantially supported her husband's testimony. She added that when Defendants were trying to handcuff Mr. Atkins, he kept his hands away from them, insisting that he had done nothing wrong. While Defendants were "subduing" Mr. Atkins, Mrs. Atkins started pleading with Deputy Lang, who had been waiting with her and the children in the kitchen, to let her go

**2.** The family room was across the foyer from the living room.

**3.** OC is a derivative of hot cayenne peppers and is the newest defensive spray agent. It is not an irritant like the tear gases, but an inflammatory agent. Contact with mucous membranes (eyes, nose, throat and lungs) will cause immediate dilation of the capillaries of the eyes, resulting in temporary blindness and instant inflammation of the breathing tube tissues, cutting off all but life-support breathing. OC does not deteriorate with age and unlike the tear gasses, does not cause lasting aftereffects.

into the family room to talk to her husband. Deputy Lang allowed her to go.

The district court held that Defendants did not have probable cause to arrest Mr. Atkins on any domestic violence charge, and that he was entitled to resist an unlawful arrest and would not be guilty of resisting arrest or assaulting an officer in connection with that charge. It also held that the officers did have probable cause to arrest him for making a 911 call for an improper purpose and the officers were entitled to qualified immunity for arresting him on that charge. The district court finally held that there were issues of fact as to whether the amount of force used was excessive, as well as with respect to the events that night and, accordingly, denied Defendants' motion for summary judgment on the basis of qualified immunity.

## ANALYSIS

The doctrine of qualified immunity shields public officials acting within the scope of their official duties from civil liability. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Qualified immunity" is an "an *immunity from suit* rather than a mere defense to a liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The Supreme Court has insisted that the lower courts resolve questions of qualified immunity "at the earliest possible stage in the litigation." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). In *Saucier,* the Court has set forth a two-prong test that must be applied to a qualified immunity analysis. *Id.*

First, a court must consider whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutionally-protected right. *Saucier,* 533 U.S. at 201; *see also Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001). If the plaintiff fails to prove an existence of a constitutional violation, then the court need not address the issue of qualified immunity because the plaintiff's constitutional claim has already failed. *See, e.g., Houston v. Clark County Sheriff Deputy,* 174 F.3d 809, 815 (6th Cir.1999). Second, if such a violation is found, the court must ask whether a reasonable official would, at the time the act was committed, understand that his conduct violated that right. *Saucier,* 533 U.S. at 201–02; *Comstock,* 273 F.3d at 702. Government officials will be shielded from liability for civil damages as long as their conduct does not amount to a violation of clearly established rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818. For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202. Qualified immunity is an effective defense for "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Court explained in *Saucier,*

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken under-

standing as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier,* 533 U.S. at 205. Qualified immunity protects police officials from the "hazy border between excessive and acceptable force." *Id.* at 206 (quoting *Priester v. Riviera Beach,* 208 F.3d 919, 926–27 (11th Cir.2000)).

Defendants appeal the district court's finding that they violated Mr. Atkins clearly established constitutional right not to be arrested without probable cause and not to be subjected to excessive force. Before addressing these arguments, we must note that there are a number of factual disputes in this case. To have jurisdiction over this appeal, we consider only facts as asserted by Plaintiffs and decide whether those facts, as a matter of law, show a violation of a clearly established law. *Williams v. Mehra,* 186 F.3d 685, 690 (6th Cir.1999) (en banc).

*Probable Cause*

■ Probable cause to arrest someone exists if "the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Diamond v. Howd,* 288 F.3d 932, 936–37 (6th Cir.2002) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). "The existence of probable cause in a section 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* at 937 (citing *Klein v. Long,* 275 F.3d 544, 550 (6th Cir.2001)). This Court makes no

credibility determinations on a motion for summary judgment and takes the evidence in light most favorable to the plaintiff. *See, e.g., Bass v. Robinson,* 167 F.3d 1041 (6th Cir.1999) (reversing the district court's grant of summary judgment on defendant police officer's qualified immunity defense where the plaintiff's verison of the material events differed from the defendant's version and where the plaintiff's version, if accepted, supported a claim for excessive force).

The district court concluded that Plaintiffs' version of the events clearly established that Defendants lacked probable cause to arrest Mr. Atkins on the domestic assault charge. *Atkins,* slip op. at 15. We agree. Defendants strenuously argue that recently the police have been severely criticized for their failure to adequately deal with domestic abuse and that they were merely trying to be thorough. However, Plaintiffs are not complaining that Defendants were making an investigation; rather they object to Defendants' conduct during the investigation. While Defendant Green says he stepped in front of Mr. Atkins and separated Mr. and Mrs. Atkins because Mr. Atkins slapped Mrs. Atkins' hand (or hands) down when she raised them defensively, Plaintiffs deny any such event took place. While Mr. Atkins admits he raised his arm, he claims it was merely to get his wife's attention.

The district court also concluded, and we agree, that "Plaintiffs' version of the events supports the contention that he did not assault any officer and that they would not have had probable cause to believe he did." *Atkins,* slip op. at 17.[4]

Finally, the district court concluded that there was probable cause to arrest Mr.

---

4. Defendants claim that when Green stepped in between Mr. and Mrs. Atkins, Mr. Atkins tried to choke him.

Atkins for calling 911 for an improper purpose. The court stated that "there certainly was probable cause to arrest Mr. Atkins since both he and Mrs. Atkins told the officers that the call was made as a joke. A joke is an improper purpose, and therefore Defendants are entitled to qualified immunity as to their arrest of Mr. Atkins on that charge." *Atkins*, slip op. at 18. This statement is confusing and is subject to two different interpretations. Under the first interpretation, the officers had probable cause to arrest Mr. Atkins on charges of making an improper 911 call and therefore it was irrelevant whether or not they had probable cause for an arrest on domestic abuse and assaulting a police officer charges. Under the second one, Defendants had probable cause to arrest Mr. Atkins on charges of making an improper 911 call but not on the other two charges, leaving open the possibility of a viable § 1983 action on those two charges. The second reading is legally erroneous because to avoid § 1983 liability, Defendants only needed probable cause to arrest Mr. Atkins on *a* charge; they did not need probable cause to arrest him on *all* charges. Nevertheless, it appears that the district court adopted the second reading because in its discussion of excessive force, it referred to the arrest as "unlawful." *Atkins*, slip op. at 20. Accordingly, we find that the district court erred if it concluded that Mr. Atkins could maintain a § 1983 action based on a violation of his clearly established right to be free from an arrest without a probable cause. Defendants had probable cause to arrest him for making an improper 911 phone call. They did not need probable cause for any other charges.

*Excessive Force*

■ Our conclusion that the police had probable cause to arrest Mr. Atkins for making an improper 911 phone call does not end our inquiry in this case. We must also decide whether Defendants used excessive force against Mr. Atkins. Claims of excessive force are analyzed under the Fourth Amendment reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir.2002). As the *Graham* Court explained:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the force that is necessary in a particular situation. As in other Fourth Amendment contexts, however, the "reasonableness" inquiry is an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Graham*, 490 U.S. at 396–97 (citations omitted). When evaluating an excessive force claim, this Court pays "particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting

arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park,* 255 F.3d 301, 307 (6th Cir.2001) (quoting *Graham,* 490 U.S. at 396). The district court concluded that "there are two events that could constitute excessive force: Defendants spraying Mr. Atkins twice with pepper spray, and Officer Abdella hitting Mr. Atkins in the leg with a baton three times. Taking the facts in the light most favorable to Plaintiff, Defendants [sic] actions were not objectively reasonable." *Atkins,* slip op. at 20 (relying on two decisions from this Court).[5] The district court also found that "it was equally clear that since the arrest was unlawful, the use of force used to effectuate the arrest was also unlawful." *Id.* We must disagree with the last statement because, as explained above, Defendants had probable cause to arrest Mr. Atkins for making an improper 911 phone calls. Accordingly, it cannot be said that the arrest was unlawful. Rather, the two possible questions before us are whether, given Plaintiffs' version of the events, a reasonable officer would twice spray and three times hit the arrestee with a baton (1) without verbally informing him that he is being arrested or (2) in arresting him for simply making a prank phone call. We decline to answer the second question because it raises very fact-specific issues about what level of force would be commensurate with what type of violation; issues that are not appropriate for us to decide at this stage. We do, however,

conclude that a reasonable officer would ordinarily inform a suspect either that he was being arrested where the charge is making a 911 call for an improper purpose, or, at least, that making an improper 911 call is a crime. *Accord Adams,* 31 F.3d at 385 (rejecting the § 1983 defendant's argument that he did not need to inform a suspect he is under arrest when there was ample time to inform the plaintiff that he (defendant) wanted to cite plaintiff for a seat belt infraction). In doing so, we are not establishing a standard for when it is or is not appropriate to tell a suspect he is being arrested. We merely find, based on the facts that we must accept for the purposes of this appeal, that (1) Mr. Atkins was not told that he was under arrest, (2) he did not start the physical altercation, and (3) there was no reason not to tell him he was under arrest.

## CONCLUSION

For the reasons stated above, we affirm, on different grounds, the district court's order denying Defendant's motion for summary judgment on the basis of qualified immunity.

---

5. In *Greene v. Barber,* 310 F.3d 889, 898 (6th Cir.2002), this Court noted that "at least for the purposes of analysis," using pepper spray on the arrestee who was resisting arrest could be excessive force, if the crime was not severe (e.g., low-level public disturbance) and if the arrestee was not threatening anyone's safety or attempting to flee. In *Adams v. Metiva,* 31

F.3d 375, 385 (6th Cir.1994), this Court held that the plaintiff's version of the events could support a claim of excessive force when the police used mace to arrest the plaintiff for a seatbelt infraction, even though the plaintiff posed no danger to the arresting officers and apparently was not told he was under arrest.