NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0221n.06

No. 09-3764

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 08, 2010
LEONARD GREEN, Clerk

JOSEPH KIJOWSKI,                          )
                                          )
        Plaintiff-Appellant,              )
                                          )
v.                                        )        On Appeal from the United States
                                          )        District Court for the Northern
CITY OF NILES et al.,                     )        District of Ohio
                                          )
        Defendants,                       )
                                          )
CRAIG AURILIO,                            )
                                          )
        Defendant-Appellee.               )

Before:      KEITH, BOGGS, and GRIFFIN, Circuit Judges.

        BOGGS, Circuit Judge.  Joseph Kijowski was arrested during a donnybrook at a

wedding reception.  According to Kijowski, police officers dragged him from a truck, threw him to

the ground, shocked him twice with a Taser, and kicked him repeatedly.  Kijowski subsequently

brought suit in state court, claiming he was entitled to damages under 42 U.S.C. § 1983 because the

officers violated his Fourth Amendment right to be free from the use of excessive force.  The case

was then removed to federal court, where Officer Craig Aurilio, one of the defendants, asserted

qualified immunity and moved for summary judgment.  The district court granted his motion, and

Kijowski now appeals.  Viewing the facts in the light most favorable to Kijowski, Officer Aurilio's

conduct was objectively unreasonable and violated a clearly established constitutional right. We therefore **REVERSE** and **REMAND** for further proceedings.

I

On October 28, 2006, things got out of hand at Aulizio's Banquet Center in Warren, Ohio. That night, the Banquet Center hosted a wedding reception, at which Kijowski was a guest.[1] What should have been a wholly joyous occasion soured after Reuben Shaw, an off-duty police officer hired by the Banquet Center to provide security, observed the groom urinating in the parking lot. Officer Shaw approached the groom and suggested that he "use the restrooms inside." Someone—possibly Kijowski's brother, possibly the groom's—then grabbed Officer Shaw from behind, telling him that the man he was speaking to was the groom and that he "better respect that."[2] The situation escalated when the interloper called Officer Shaw "a security guard" and pushed him with both hands. The pair then "locked up for a short struggle." Officer Shaw eventually wrestled his opponent to the ground, but this prompted the groom to jump on Officer Shaw's back. Although Officer Shaw was able to shake him off, three more wedding guests joined the fight. Wisely, Officer Shaw radioed for backup.

In response to Officer Shaw's call for help, the entire shift of the Warren Police Department, as well as members of other nearby departments, arrived at the Banquet Center. One of the

---

[1] The district court concluded that the wedding reception was that "of Kijowski's brother[.]" However, Kijowski's affidavit appears to indicate that, though his brother was in attendance, he was not the groom. Officer Aurilio's brief suggests that the groom's name was Robert Peyatt.

[2] Exactly which man micturated and which confronted Officer Shaw is somewhat unclear. The precise role of each in the altercation is, however, irrelevant.

responders was Officer Aurilio,[3] a member of the City of Niles Police Department. According to his affidavit, Officer Aurilio arrived to find that members of the Warren Police Department had already taken several subjects into custody. He also alleges that police were attempting to arrest a number of others "who were actively resisting." Officer Aurilio's affidavit indicates that he proceeded to "assist[] Warren police officers in subduing a man who was extremely combative and resisting the attempts of the Warren officers to handcuff him." To do so, Officer Aurilio "deployed [his] Taser in drive stun mode on [the] suspect male which allowed Warren officers to handcuff him." Officer Aurilio was later "informed by the Warren Police Department that the aforementioned suspect was [Kijowski]."

Kijowski's account of the evening is quite different and begins in the Banquet Center. Kijowski claims that, during the initial altercation involving Officer Shaw, he was inside cleaning up. In his affidavit, Kijowski states that he then left the Banquet Center and got into a truck, where he was joined by the groom. At that point, he alleges, "several members of various Trumbull County police departments—probably Howland, Warren, and Niles—appeared at the Banquet Center" and began spraying Mace into a crowd that had gathered outside. Because police were "beating and [M]acing party-goers," Kijowski claims that he reported what he saw, whereupon he was transferred to Warren dispatch. After briefly conversing with Kijowski, the dispatcher contacted officers on the scene, stating that Kijowski was on the phone "bothering [him]."[4]

---

[3]With Officer Aurilio was Officer Jaisan Holland, who submitted an affidavit substantially corroborating Officer Aurilio's account.

[4]This portion of the call was recorded, and it is consistent with Kijowski's narrative.

As a result, Kijowski contends, a number of police officers, including Officer Aurilio, approached the truck.[5] Some of them "began pounding on the truck, yelling at [Kijowski] to hang up the phone and get out of the truck." Telling officers he was afraid to get out, Kijowski spotted Officer Crank, a member of the City of Niles Police Department whom Kijowski knew. Kijowski contends that he called Officer Crank over and that Officer Crank "told the other officers that [Kijowski] was O.K. and that [he] was not making trouble[.]"

Officer Crank then left, Kijowski claims, and just as he did, Kijowski "felt [him]self being dragged out of the truck and thrown to the ground face first[.]" The officers then crushed Kijowski's phone, and "[t]he next thing he felt was a sudden jolt of electricity to [his] mid back, and boots kicking [his] left side[.]" "As soon as [his] muscles turned weak," he says, "[he] felt the jolt again." After he was shocked for a second time, "[t]he officers continued kicking [him][.]" According to Kijowski, he then heard someone say, "the State boys are here," at which point the "beating stopped[.]"

A report prepared by Officer Shaw indicates that, following the incident, Kijowski was arrested for assault. However, Kijowski was never indicted on assault charges. He did face an indictment for disorderly conduct, but neither party asserts that he was found guilty of any crimes stemming from the episode.

---

[5]Kijowski does not explicitly say that Officer Aurilio was one of the officers who came up to the vehicle. Rather, he claims, "[W]ithin seconds of speaking with Warren dispatch, police officers began pounding on the truck, yelling at me to hang up the phone . . . . That is, on finding out from the 911 operator that I called emergency services, Craig Aurilio and the John Does sought me out[.]" A natural implication of this statement is that Officer Aurilio was among the group of officers who confronted Kijowski.

No. 09-3764
Joseph Kijowski v. City of Niles et al.

On October 24, 2008, Kijowski filed a complaint against Officer Aurilio, the City of Niles, the City of Niles Police Department, and several unnamed officers, raising, *inter alia*, an excessive force claim under 42 U.S.C. § 1983. The suit was filed in the Trumbull County Court of Common Pleas, but on November 24, 2008, it was removed to the United States District Court for the Northern District of Ohio.

The district court held a case management conference, at which it directed the parties to brief the issue of qualified immunity, and discovery was stayed pending resolution of the matter. One month later, Officer Aurilio moved for summary judgment, and Kijowski opposed. Despite Kijowski's opposition, the district court granted Officer Aurilio's motion, precipitating this appeal.

II

"We review a district court's decision granting summary judgment de novo." *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2009) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002)). Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000) (citing *Northland Ins. Co. v. Guardsman Prods., Inc.*, 141 F.3d 612, 616 (6th Cir. 1998)). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

With respect to the issue of qualified immunity, the proper standard of review is also *de novo*.

No. 09-3764
Joseph Kijowski v. City of Niles et al.

*See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 346 (6th Cir. 2001) ("Qualified immunity

is a question of law . . . to be reviewed *de novo* by this [c]ourt."); *Dickerson v. McClellan*, 101 F.3d

1151, 1157 (6th Cir. 1996) ("We conduct de novo review because the issue whether qualified

immunity is applicable to an official's actions is a question of law.").

III

To prevail on his § 1983 claim, Kijowski "must establish that a person acting under color of

state law deprived [him] of a right secured by the Constitution or laws of the United States." *Smoak

v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (citing *Waters v. City of Morristown*, 242 F.3d 353,

358–59 (6th Cir. 2001)).  A defendant may assert "the defense of qualified immunity, which shields

government officials from 'liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Ibid.*

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Indeed, "[i]n qualified immunity cases,

the plaintiff bears this burden; he must show that the defendant is not entitled to qualified

immunity."[6] *Wysong v. City of Heath*, 260 F. App'x 848, 852 (6th Cir. 2008) (citing *Wegener v. City

of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

When determining whether the allegedly injured party has met this burden, "this court

typically employs a two-step analysis," asking: "'(1) whether, considering the allegations in a light

most favorable to the party injured, a constitutional right has been violated, and (2) whether that right

---

[6]Of course, if Officer Aurilio had not invoked the defense of qualified immunity, Kijowski would be under no obligation to refute it. *See Harlow*, 457 U.S. at 815 ("Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official.").

No. 09-3764
Joseph Kijowski v. City of Niles et al.

was clearly established.'" *Smoak*, 460 F.3d at 777 (quoting *Estate of Carter v. City of Detroit*, 408

F.3d 305, 310 11 (6th Cir. 2006)).[7] We may consider either step first. *See Pearson v. Callahan*, 129

S. Ct. 808, 818 (2009).

A

Kijowski alleges that, in twice shocking him with a Taser, Officer Aurilio violated his Fourth

Amendment rights.[8] "The Fourth Amendment prohibits the use of excessive force by arresting and

investigating officers." *Smoak*, 460 F.3d at 783. In evaluating whether this prohibition has been

violated, we employ an "objective reasonableness" test, which requires consideration of the totality

of the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he question is whether

the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

---

[7]As we noted in *Grawey v. Drury*, "[s]ome panels of the Sixth Circuit have employed a third step requiring the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right." 567 F.3d 302, 309 (6th Cir. 2009). "In excessive force cases, however, because the defendant's conduct must have been objectively unreasonable to find a constitutional violation, the third step is redundant. Thus, qualified immunity in excessive force cases is a two-step analysis." *Ibid.* (internal citations omitted).

[8]Kijowski suggests that the police also violated his rights by pulling him from the truck, slamming him to the ground, and kicking him. *See* Appellant's Br. at 22. However, the only conduct he specifically attributes to Officer Aurilio is use of the Taser. Because "[e]ach defendant's liability must be assessed individually, based on his or her own actions[,]" *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008), we confine our analysis to the actions Officer Aurilio is claimed to have taken. Admittedly, "[t]his court has held . . . that a police officer who *fails* to act to prevent the use of excessive force [by another officer] may still be held liable[.]" *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008). But liability for failure to prevent the use of force only attaches "where '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Ibid.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). As Kijowski has alleged none of the requisite elements, he cannot rely on this theory.

them, without regard to their underlying intent or motivation."); *Summerland v. County of Livingston*, 240 F. App'x 70, 76 (6th Cir. 2007) ("The ultimate question is 'whether the totality of the circumstances justified a particular sort of search or seizure.'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985))). "The test is fact specific, not mechanical, and the three most important factors for each case are: (1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." *Wysong*, 260 F. App'x at 854.

Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This inquiry must be conducted with sufficient respect for the fact that police officers often confront exceedingly perilous situations where detached rumination risks loss of life. *See id.* at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

"With these considerations in mind, we slosh our way through the factbound morass of reasonableness." *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008) (quoting *Scott*, 550 U.S. at 383) (internal quotation marks omitted). We must first examine a critical factual issue—whether Kijowski was resisting arrest—as we cannot undertake the reasonableness analysis without assessing the circumstances confronting Officer Aurilio. *See Scott*, 550 U.S. at 378 ("The first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts."). In piecing together

No. 09-3764
Joseph Kijowski v. City of Niles et al.

the evening's events, we are of course required to apply the deferential summary judgment standard outlined above.

That said, it can reasonably be inferred from Kijowski's account that he did not resist arrest. According to Kijowski, a number of officers, including Officer Aurilio, accosted him while he was seated in a truck. As Kijowski tells it, he then summoned Officer Crank, who explained that Kijowski was not causing any trouble.[9] Kijowski asserts that Officer Crank departed shortly thereafter. "*As soon as Crank left*," Kijowski claims, "[h]e felt [him]self being dragged out of the truck and thrown to the ground face first[.]" If the officers truly laid hands on him immediately after Officer Crank walked away, then there was no intervening window of time during which to resist.

Similarly, drawing reasonable inferences in his favor, Kijowski's affidavit provides evidence that, after he was tossed to the earth, he was shocked at once. Following his removal from the truck, he claims, "*[t]he next thing [he] felt* was a sudden jolt of electricity to [his] mid back[.]" Like Kijowski's previous statement, this language appears to foreclose the possibility of intervening physical struggle. As a consequence, we may reasonably infer that no resistance was offered prior to Officer Aurilio's initial use of his Taser. There simply was no time.

Nor was there an opportunity for Kijowski to struggle between the first and second Taser shocks. "*As soon as my muscles turned weak*," he says, "I felt the jolt again[.]" If the second shock

---

[9]While it is true that "evidence submitted in opposition to a motion for summary judgment must be admissible," *U.S. Structures, Inc. v. J.P. Structure, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997), this rule does not bar our consideration of Officer Crank's out-of-court statement, as the statement would not be offered to prove the truth of the matter asserted. Rather, the statement would be relevant to assessing the perceptions of the officers who heard it.

actually followed on the heels of the first, the only tenable conclusion is that it would have been impossible for Kijowski to muster any fight. Thus, given our obligation to draw all reasonable inferences in his favor, we must assume that at no time during his encounter with Officer Aurilio did Kijowski resist arrest.

Proceeding from this assumption and taking into account the totality of the circumstances, we cannot say that Officer Aurilio's conduct was objectively reasonable as a matter of law.[10] In *Casey v. City of Federal Heights*, the Tenth Circuit remarked:

> [W]e have held that it was not excessive for officers to use an "electrical stun gun" on a man after grabbing him and wrestling him to the ground. But we noted that what justified this conduct was his active resistance to arrest—[the man] was kicking and biting the officers and had shoved one of them to start the fight.

509 F.3d 1278, 1285 (10th Cir. 2007) (citing *Hinton v. City of Elwood*, 997 F.2d 774, 776–77 (10th Cir. 1993)). Without active resistance, the equation is different. "[A] stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993). Absent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of such a weapon on a non-resistant person is unreasonable. *See Wysong*, 260 F. App'x at 855 ("There is no government interest in striking someone who is neither resisting nor trying to flee."); *cf. Casey*, 509 F.3d at 1285 (declining to "rule out the possibility that there might

---

[10]We are mindful that "[s]ome of our cases analyze excessive force claims in segments," *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996), an approach that potentially requires us to evaluate the Taser shocks independently. We nonetheless refer to the shocks collectively, as our analysis is applicable to both.

be circumstances in which the use of a Taser against a nonviolent offender is appropriate"). Consequently, because Kijowski offered no resistance, Officer Aurilio's use of his Taser cannot be considered reasonable without some other indication that Kijowski posed a threat.

But there was no such indication. True, the scene at which Officer Aurilio arrived was chaotic, but general bedlam does not necessarily justify the use of force against any particular individual. When police approached Kijowski, he was inside a truck, talking to a 911 operator. Nothing in the record suggests that he was attempting to drive the truck or that he had any kind of weapon on his person. Furthermore, assuming the veracity of Kijowski's account, Officer Crank assured the other officers that Kijowski was not causing any trouble. Under these circumstances, a reasonable officer on the scene would not have perceived Kijowski as presenting a risk of harm.

Accordingly, we conclude that, if Kijowski's version of events is correct, Officer Aurilio deployed his Taser unreasonably, thereby violating Kijowski's Fourth Amendment right to be free from the use of excessive force.

B

Even if Officer Aurilio's actions were objectively unreasonable, he is still entitled to qualified immunity unless it is shown that the right he violated was clearly established. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*

- 11 -

*v. Katz*, 533 U.S. 194, 202 (2001). "Although it need not be the case that 'the very action in question has previously been held unlawful, . . . in the light of pre-existing law the unlawfulness must be apparent.'" *Russo*, 953 F.2d at 1042 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848.

In this case, we find little difficulty in concluding that the right Officer Aurilio allegedly violated was clearly established. As we observed in *Wysong*, "the right to be free from physical force when one is not resisting the police is a clearly established right." 260 F. App'x at 856. "Even without precise knowledge that the use of the [T]aser would be a violation of a constitutional right," Officer Aurilio "should have known based on analogous cases that [his] actions were unreasonable." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008). Relevantly, "our court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line[.]" *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). We have also held that "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest and is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (citing *Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004)). Against the backdrop of existing law, Officer Aurilio could not reasonably have believed that use of a Taser on a non-resistant subject was lawful.

## IV.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment on the issue of qualified immunity and **REMAND** for further proceedings.